[Civ. No. 23891. First Dist., Div. Two. Aug. 27, 1968.]

THEODORE H. BARTH et al., Plaintiffs and Appellants, v. B. F. GOODRICH TIRE COMPANY, Defendant and Appellant; PERRY & WHITELAW, INC., Defendant and Respondent.

Hoberg, Finger, Brown & Abramson and John M. Finger for Plaintiffs and Appellants.

Sedgwick, Detert, Moran & Arnold, Scott Conley, Bacon, Mundhenk, Stone, O'Brien & Hammond and W. F. Stone for Defendant and Appellant.

Low, Ball & Norton, Low & Ball and Remington Low for Defendant and Respondent.

TAYLOR, J.—The cross-appeals in this products liability litigation arose from an accident that occurred after the left rear tire of a station wagon blew out and the car went out of control, over an embankment and turned over. The husband (Theodore H. Barth) and minor children (William Henry and Julie Lynne Barth, by their father and guardian ad litem) of the deceased driver (Mrs. Shirley Sue Barth), and three of the four surviving passengers (Carole Clark, Patricia Ridgway and Elizabeth Gordon), filed their respective actions for wrongful death and personal injuries against the manufacturer of the tire, B. F. Goodrich Tire Company (hereafter Goodrich), and the supplier and installer, Perry & Whitelaw, Inc. The actions were consolidated for a jury trial which resulted in verdicts against Goodrich of $207,375 for Barth, $6,000 for Clark, et al., and in favor of Perry & Whitelaw.

Goodrich appeals from the judgments in favor of Barth and Clark, et al., contending that the cumulative effect of the errors of the trial court during the trial and in its instructions to the jury deprived it of a fair trial. Barth and Clark cross-appeal from the judgments in favor of Perry & Whitelaw, contending that the trial court erroneously instructed the jury that the strict liability of Perry & Whitelaw depended on its "sale" of the tire.

As there are no contentions concerning the sufficiency of the evidence, only those facts pertinent to the issues raised are set forth. The facts relating to the Goodrich appeal and the Barth and Clark cross-appeal are set forth separately.

## I. The Goodrich Appeal

The Facts:

Viewing the record most strongly in favor of the judgment, the following facts appear: On the afternoon of April 17, 1962, Shirley Barth was driving a 1961 Chevrolet six-to-nine-passenger station wagon northbound along the coast highway in San Mateo County with five passenger friends. At the scene of the accident, the coast highway is a flat and straight two-lane road, 32 feet wide. The speed limit was 65 miles per hour. Just after Shirley Barth had passed the Pigeon Point lighthouse, the passengers heard a loud bang from underneath as if something had exploded, a sound similar to a blowout. One of them said: "It may have been a blowout. Maybe we should stop and check." Shirley was doing her best to control the car and started to apply the brakes lightly. The car began to fishtail across the center of the highway, swerved back and

forth, then went over the right embankment after striking a guardrail and turned over end-to-end before coming to rest 30 feet off the highway. All of the surviving passengers and some expert witnesses fixed the speed of the vehicle just before the accident at between 50 and 60 miles an hour; Goodrich's expert at between 58 and 70 miles an hour.

The 1961 Chevrolet station wagon with a trailer hitch was owned by Service Leasing Corporation and leased to American Floor Machine Company, Inc. (hereafter American), a manufacturer and distributor of all types of floor maintenance equipment. In September 1961, American assigned the station wagon to branch manager Barth as his own vehicle. Shirley Barth was permitted to drive the vehicle. American had 35 factory-owned branches in each major city of the country, all selling the same kind of equipment and followed the same vehicle-leasing practice at all of its branches and generally using trailers owned by American. American also had made arrangements with Goodrich on a national basis to furnish replacement tires for American's vehicles.

In October 1961, Barth had the brakes and wheels of the station wagon aligned at the House of Brakes in San Francisco. A notation on the invoice at that time noted "drums have hard spots." Barth concluded that the brake company wanted to sell him a new set of drums but thought the price was out of line. Thereafter, the brakes were fine and no other changes were made in the station wagon except for the purchase of new tires, discussed below. When Barth took the vehicle over from his predecessor, it had been equipped with Monroe load levelers to keep the car level when it was pulling the trailer. Barth did not know that the load levelers would affect the load-carrying capacity of the trailer.

In November 1961, the station wagon needed new tires. Pursuant to company procedure, Barth was informed by American's home office in Ohio that two 800 x 14 black de luxe Goodrich Silvertown rayon tubeless tires for his car had been ordered through the Biltmore Company of Chicago (a midwestern Goodrich distributor, hereafter Biltmore). Shortly thereafter, Barth received a purchase order to pick up the tires in San Francisco at Perry & Whitelaw a wholesale and retail Goodrich distributor who sold tires to individuals and serviced national accounts. On November 9. 1961, an employee of American took the vehicle to Perry & Whitelaw, who installed two tires from its stock on the rear wheels, in accordance with a standard mechanical procedure, and pro-

vided a Goodrich form warranty, including a warranty against blowouts, with its name and address stamped on it. The guarantee period was 24 months. Barth checked the serial numbers on the warranty against the tires but could not say whether he had read any of the particular provisions of the warranty. In December, by the same procedure, two other tires were obtained for the station wagon. The tires that had been obtained in November were switched to the front wheels and the two new tires put on the rear wheels. On March 7, 1962, the tires were again rotated so that the tires that had been obtained in November 1961 were placed on the rear wheels. These were the tires that were on the rear wheels at the time of the accident on April 17, 1962.

Seventy-five percent of Barth's work involved trips once a week selling equipment in northern California and Nevada. He normally carried in the station wagon a sanding machine, a floor polisher and a vacuum cleaner. In addition, about once a week he hauled an automatic floor scrubber weighing about 870 pounds for demonstration purposes in a two-wheel hydraulically operated Selma IM 46 trailer with a capacity of 1,500 pounds. He never carried more than 300 pounds in the station wagon itself and 1,000 pounds in the trailer. Every two weeks or so, he checked the tire pressure. He maintained 24 pounds of pressure in the front and 28 pounds in the rear. He never found any substantial variance in the pressure of the tires. There were no flats or punctures.

According to the tire industry approved "Tire Guide," an 800 x 14 tire was recommended for use on all 1961 Chevrolet station wagons like the Barth vehicle. The Barth vehicle was designated as either a six-or-nine-passenger vehicle designed for passengers and equipment or other property. *The owners' manual distributed with the vehicle in question indicated nothing about tire safety but only gave the recommended pressure for comfort of passengers and the life of the tire.*

A service bulletin issued by Goodrich to its dealers showed recommended pressures of 24 to 28 pounds for the tires in question, but this bulletin was not furnished to customers and included nothing about the weight that could be carried by the tires on a station wagon. Neither this publication nor any other issued by Goodrich informed the public of any tire weight limits.

The tire experts called by Goodrich testified that the maximum carrying capacity of a tire of the type in question, according to the standards then set by the Tire and Rim

Association, was 1,175 pounds and that increased tire pressure would not increase the carrying capacity of the tire. They testified that if a tire is overloaded and runs into a chuckhole or other road obstructions, it would be more vulnerable to a failure of the type found in the Barth tire, that an overload of 25 to 50 percent would be severe, and that if the tire was loaded 25 percent over the tire and rim carrying capacity, it would be expected to rupture before the tread was gone.

The engineering specifications for a 1961 Chevrolet station wagon indicated that on a loaded nine passenger station wagon, for which tires of the type here involved were specified, the rear wheels would carry 3,430 pounds. Thus, each of the rear wheels would carry 1,715 pounds. Therefore, with six 150-pound passengers riding in the vehicle, each rear tire would be overloaded by 232 pounds or about 25 percent. Accordingly, with six ladies averaging such weight in the car, the rear tires would be overloaded and the overloaded condition would be such that the tires could be expected to rupture before the tread wore out.

Goodrich knew that its tires were subject to overload and asked the car manufacturers to be more observant of recommended loads. But it never informed the public or its individual customers of the problem. Goodrich supplied the tire to the car manufacturer under these circumstances as the business was a highly competitive one. It knew that a certain percentage of tires sold would be exposed to overloading conditions.

Goodrich's witness, Poole, after describing in great detail the steps involved in the construction of a tire, testified that at the end of the process of tire manufacture and inspection, Goodrich ran into defective tires all the time. The final inspection before the tires went to the market is made by a quality control man who inspects 10 percent of the tires. This final inspection reveals both major and minor defects apparently missed in the previous inspections in a number of tires. The remaining 90 percent of the tires shipped out do not have the benefit of such a final inspection but would be subject to the same defects as those discovered in the 10 percent.

Goodrich's expert, Keltner, who had been with the organization for 39½ years, testified that if a tire carries more than 10 percent above the load authorized by the Tire and Rim Association, it would be excessively overloaded, and that the Tire and Rim Association manual states that no increase in the load is permitted for higher inflations than those shown

on the table. He also admitted that when Goodrich sent its tires out to the automobile manufacturers, it did not know what model car the tires would be used on as this was entirely up to the automobile manufacturer. Accordingly, if Goodrich received from General Motors an order for a supply of the kind of tires here involved, the order would be routinely filled and no inquiry made as to the use of the tire. He indicated that General Motors had its own limited testing program to satisfy it that the tires would not be overloaded to the extent that they believed harmful. Once Goodrich became a supplier approved by General Motors, a very important factor, General Motors had satisfied itself that the Goodrich tire would operate satisfactorily on its automobiles. Neither General Motors nor any other automobile manufacturer made available to Goodrich or any tire supplier the weight of the vehicle on which the tire would be used, and in 1961, Goodrich was unable to obtain this kind of information from General Motors.

Robert L. Collins, who had been with General Motors for 17 years, primarily working on body and chassis design, including tires, was called by Goodrich as an expert and testified that General Motors had never attempted to make a secret of the weights of their cars. Another Goodrich witness, Joseph B. Bidwell, the head of the Engineering Mechanics Department at General Motors Research Laboratories, stated that General Motors made no efforts to conceal from tire manufacturers the make and model of vehicles for which the tires would be used; that if General Motors knew the weight of the vehicle, the information would be made available to the tire manufacturers, if requested.

Bidwell and Collins stated that General Motors, in determining the tires to be used on its vehicles, made no effort to fix the rated tire-carrying capacity. The only criterion used was whether the tires were performing satisfactorily on the car. There were no other tests to determine if the maximum capacity would be "rather difficult." Accordingly, the owners' manual did not say anything about the weight that could be carried in station wagons.

As far as General Motors was concerned, "it would be all right, tire-wise" to carry nine 200 pound persons and their luggage in a 1961 Chevrolet station wagon. General Motors did not agree with the reliance of some of Goodrich's experts on Tire and Rim Association 1961 standards as a maximum. In fact, it ignored the Tire and Rim Association's recommended

load-carrying capacity. In the opinion of General Motors, 46 percent more weight than the maximum recommended by the Tire and Rim Association would not overload the tires. General Motors did not advise the purchasers of its vehicles that there was any less danger in running over a chuckhole if the vehicle were empty than if there were nine persons in it nor did it make recommendations about a trailer or the use of load levelers. As far as General Motors was concerned, the load on the tire could be doubled with complete safety if the tire pressure was increased. The only effect would be a harsher ride. Goodrich never complained that its tires were being overloaded by General Motors.

Tire manufacturers do not put out literature to the consumer relating to the overloading of tires, nor ever inform the public or anyone else that there could be any danger in overloading Goodrich tires. Furthermore, Goodrich never made any recommendations that there were certain types of roads on which their tires could or should not be driven. Customers were not warned that if they ran into a chuckhole a tire failure might result. Goodrich never excluded the application of its tire warranty to any conditions of overload or driving at sustained high speeds over rough roads.

In fact, in 1961, Goodrich ran an advertisement in Newsweek, Readers' Digest (and possibly Life magazine), that was rerun in the Oakland Tribune six to ten times, showing a tire with a sidewall comparable in strength to the one here, being driven over sharp rocks and boulders. Goodrich paid 50 percent of the cost of the rerun of this advertisement in the local paper. Goodrich's expert, Keltner, had never seen or heard of such an advertisement and testified that such treatment of a tire would constitute an abuse that could cause an incipient failure in any tire in the world. He also stated, ". . . anybody that drives a car over one mile an hour across that kind of condition would be foolish."

Keltner also testified as to the harm to the tire from the use of load levelers on a vehicle, although the load leveler itself does not increase the stress on the tires. However, a Goodrich-approved parts manual sent to its distributors, including Perry & Whitelaw, included Monroe load levelers of the type here involved, as a Goodrich-approved part. Some Goodrich dealers installed load levelers and Goodrich never put out anything recommending against the installation of load levelers. Goodrich never advised that greater stress would be imposed on the tires if load levelers were so used. Perry &

Whitelaw installed Monroe load levelers but never so advised its customers.

Goodrich also never put out any literature on the subject of towing trailers or referred specifically to one of the size normally pulled by the Barth wagon. Goodrich neither warned against pulling trailers nor recommended that a different type of tire should be used on a vehicle that did. As a dealer, Perry & Whitelaw also never warned against this practice. Mr. Whitelaw testified that they never issued any such warning, as he pulled one all around the United States. Neither Goodrich nor Perry & Whitelaw ever indicated it would be improper to haul a trailer loaded to its rated capacity of 1,500 pounds. Perry & Whitelaw was never told by Goodrich and did not tell its own customers how a trailer should be loaded or balanced.

The 4-ply rayon tubeless tire here involved was available for examination by the various expert witnesses at the trial. The blowout or rupture on the tire occurred on the side away from the road so that the user would not have been aware of any incipient damage unless he had been under the car a short time before the tire failure occurred. There was a definite crack in the interliner which allowed air to escape into the outerply. This created a bubble in the outermost ply that grew large and burst.

The experts disagreed as to the classification of the rupture. Goodrich and Perry & Whitelaw's expert called it a ''sidewall flex break'';[1] the Barth and Clark expert Meyers indicated that the tire was broken above the ''bead'' toward the tread, while a sidewall flex break is usually higher, near the shoulder of the tire. Meyers saw no indication that the Barth tire had been overloaded or underinflated or that anything in the driving had anything to do with the failure of the tire. In addition to overloading, the cause of the tire failure could be attributed to a combination of structural characteristics typical of Goodrich tires during the period of time in question.

According to Meyers, the defect in the Barth tire was recognized by the industry as due to a defect in manufacture

---

[1] A tire consists of a rubber tread that is bound to nylon or rayon cords impregnated with rubber and other materials that are called ''plys'' and which, laid perpendicular to each other, form the sidewalls. Attached to these ''plys'' are ''beads'' that are made up of a number of turns of steel wires insulated with rubber compounds and repeated in fabric. These ''beads'' hold tight and taut the finished tire along the circumference of the sidewalls which come in contact with the rim of the wheel. Under conditions of heat, the rubber loses its adhesive ability with the cords and allows the cords and plys to separate.

as distinguished from an "adjustable condition" on the tire warranties, which would include road hazards. The Goodrich "Adjustment Procedures" manual for retailers stated that tires with a flex break in the lower sidewall or near the shoulder "may be adjusted on a service rendered basis under the Road Hazard Warranty."

Goodrich's expert Poole testified that in his opinion, a rupture or failure of a tire in the particular location here involved, starts from either overloading or underinflation. As a result of either, the cords will weaken, and the continued flexing of the sidewalls while the tire is in motion will cause the tire to fail. He further stated that the failure could also be started by a blow to the tire. However, if the tire had been overloaded or underinflated at the time of such a blow, the blow might not necessarily rupture the cords but would weaken the cords. In Poole's opinion, the ultimate failure of the Barth tire began with a blow of some kind.

Goodrich's expert Bull stated that there was no sign of abuse or evidence that the tire had failed because of any fault, but that the tire might have received a blow from running over a chuckhole or as the result of an impact with a curb. This blow could have occurred as little as 50 miles or as much as 1,000 miles before the tire ruptured. As far as wear was concerned, 60 percent of the wear was left on the tire, which meant that the tire was in excellent condition with no falling off beyond the outer ribs. Bull stated that the tire gave promise of giving mileage up to 35,000 to 40,000 miles; that 60 percent of the tread was left and uniformly worn, without bruises or cuts, and that the tire would have to have been carefully driven to be in this condition. According to Bull, the tire was deflated a little more than standard or normal. Bull did not rule out the possibility of a defect in the tire.

Mr. Whitelaw also testified that the evenness of the wear and deep tread remaining on the Barth tire after 16,700 miles was readily visible; in his opinion, the particular tire did not appear to have been abused and was doing a good job mileage-wise.

█ Goodrich first asserts that the court erred in permitting a punitive damage amendment to the Clark and Barth causes of action after the Goodrich experts had testified at the trial. We think, however, that the 12-day recess proffered to Goodrich to meet this amendment was ample and that the uncontroverted evidence, showing that Goodrich knew of the danger of overloading and deliberately neglected, for business reasons, to caution customers and the unknowing public,

would clearly justify the punitive damage charge based on grounds of fraud, malice and oppression (*Donnelly* v. *Southern Pac. Co.*, 18 Cal.2d 863 [118 P.2d 465]; *Morgan* v. *French*, 70 Cal.App.2d 785 [161 P.2d 800]; *Sturges* v. *Charles L. Harney, Inc.*, 165 Cal.App.2d 306 [331 P.2d 1072]). While the amendment should have been limited to the nonwrongful death causes of action (Prob. Code, § 573; Code Civ. Proc., § 377; *Doak* v. *Superior Court*, 257 Cal.App.2d 825, 835 [65 Cal.Rptr. 193]), the error was of no consequence since the jury allowed no punitive damages.

It is doubtful whether the admission of evidence of Goodrich's financial condition under the punitive damages allegation affected the judgment in this case since Goodrich is universally recognized as a large and prosperous corporation. But, in any event, such evidence was admissible since the punitive damage amendment properly applied to the nonwrongful death causes of action (*Parrott* v. *Bank of America*, 97 Cal.App.2d 14 [217 P.2d 89, 35 A.L.R. 263]). Furthermore, although the judgment was large, we do not regard the damages as excessive as a matter of law.

Goodrich contends that evidence of Barth's remarriage a year and a half after Shirley's death should have been admitted to mitigate damages. It is the well established rule in most states, including California, that the remarriage of a surviving spouse is not admissible on the issue of damages in a wrongful death case (*Benwell* v. *Dean*, 249 Cal.App.2d 345 [57 Cal.Rptr. 394]; 87 A.L.R.2d 252) and this court is neither inclined nor does it have the authority to change this rule.

The Instructions

We turn to the various alleged errors in the instructions to the jury on strict liability, breach of warranty and negligence.

1. Strict Liability.

Goodrich first argues that the jury should not have been instructed on the doctrine of strict liability as Barth failed to plead and prove that the tire was being used as intended. Goodrich concedes that the tire was not used for any other purpose except as a tire but argues that because of misuse and abuse and overloading or underinflation, Barth and Clark deprived themselves of the protection of the doctrine.

As stated in *Greenman* v. *Yuba Power Products Inc.*, 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]: "A manufacturer is strictly liable in tort when an

article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being'' (p. 62).

''To establish the manufacturer's liability it was sufficient that plaintiff proved that he was injured while using the Shopsmith in a way it was intended to be used as a result of a defect in design and manufacture of which plaintiff was not aware that made the Shopsmith unsafe for its intended use'' (p. 64).

Here, the great preponderance of evidence indicates that Barth did not abuse the product or use it for other than the intended purpose. There is no evidence that the tires were at any time underinflated as Goodrich claims. Rather, the uncontroverted evidence indicates that Barth checked the tires every two weeks and that at all times, the pressure was between 24 and 28 pounds for the front and rear tires, respectively, as recommended by the owners' manual.

Goodrich's own witnesses admitted that it had never informed the public of any danger of overloading arising out of the normal use of a six-passenger vehicle as in this case, and General Motors' experts, called by Goodrich, testified that the tires could have supported double their normal carrying weight and still not have been overloaded.

Most of the evidence indicated that the vehicle was not being driven at an excessive speed, but, in any event, there was no evidence that Goodrich ever advised its dealers or customers as to the effect of such speeds on the tires. The testimony of Goodrich's own experts indicated that since 60 percent of the tread was left on the tire in question, it must have been carefully and well driven, and that there was no evidence of abuse.

In view of the overwhelming evidence that the tire was being used as intended, and had been driven carefully and at reasonable speeds, the trial court properly concluded that plaintiffs had produced sufficient evidence on the doctrine of strict liability and properly instructed the jury thereon.

Goodrich next argues that the trial court erred in its instructions on the burden of proof by refusing to give its proposed Instruction No. 31 (set forth below in the footnote).[2] In *Alvarez* v. *Felker Mfg. Co.*, 230 Cal.App.2d 987, 1003 [41 Cal.Rptr. 514], this court (Division One) held a

---

[2]Instruction No. 31: ''If you should find that it is just as probable that the accident in question was proximately caused by some misuse or abuse, if any, of the tire in question while it was used on the Chevrolet

substantially similar instruction to be a misstatement of the law insofar as the manufacturer's strict liability in tort is concerned. ▓ The trial court is not compelled to redraft a proposed inaccurate instruction (*Hyde* v. *Avalon Air Transport, Inc.*, 243 Cal.App.2d 88 [52 Cal.Rptr. 309]). ▓ The record indicates that the general instructions on the burden of proof were adequate and correct.

▓ There is no merit in Goodrich's contention that the court erred in instructing the jury that the contributory negligence of Shirley was not a defense to the causes of action based on strict liability. ▓ As stated in the comment in section 402 of the Restatement Second of Torts, since the doctrine of strict liability is not based on the negligence of the seller, the contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product or to guard against the possibility of its existence. ▓ The only form of plaintiff's negligence that is a defense to strict liability is that which consists in voluntarily and unreasonably proceeding to encounter a known danger, more commonly referred to as assumption of risk. For such a defense to arise, the user or consumer must become aware of the defect and danger and still proceed unreasonably to make use of the product. This rule has been consistently followed and repeated by the courts of our state (*Seely* v. *White Motor Co.*, 63 Cal.2d 9 [45 Cal. Rptr. 17, 403 P.2d 145] ; *Canifax* v. *Hercules Powder Co.*, 237 Cal.App.2d 44, 46 [46 Cal.Rptr. 552] ; see Prosser, *Strict Liability to the Consumer in California*, 18 Hastings L.J. 9, 48-50).

▓ The record here contains no evidence on which any such defense could be based as there is no evidence of any defect in the tire known to Barth or his wife. Goodrich's expert testified that in order to discover the particular defect, the user would have had to have looked at the tire from underneath the car. There was also no evidence of any use of the tire not expressly sanctioned by Goodrich. Accordingly, Goodrich's proposed Instruction No. 16 on contributory negligence was properly refused and the jury correctly instructed that it was not a defense to strict liability.[3]

automobile as it is that it resulted from some defect, if any, in the tire itself, then, if you so find, your verdict should be for the defendant, the B. F. Goodrich Company.''

[3]Goodrich's proposed Instruction No. 38 was also properly refused as it invoked the contributory negligence defense not only as to the causes of action based on negligence but also as to the strict liability and implied

Goodrich argues that there was no evidence of any defect in the tire and that the trial court erred in instructing the jury as follows: "You are instructed that a manufacturer and seller are strictly liable when an article they place on the market, knowing that it is to be used without inspection for defects, has at that time a defect that causes injury to a human being."

Goodrich's contention overlooks the testimony of its expert Bull, who did not rule out a defect, and the testimony of Barth and Clark's expert Meyers concerning the existence of a defect in the tire and that such defects were characteristic of certain Goodrich tires during the time in question.

Goodrich next argues that the court erred further by also instructing the jury as follows: "The word 'defect' as used in the previous instructions, refers not only to the condition of the product itself, but may include as well the failure to give directions or warnings as to the use of the product in order to prevent it from being unreasonably dangerous. If directions or warnings as to the use of a particular product are reasonably required in order to prevent the use of such product from becoming unreasonably dangerous, the failure to give such warnings or directions, if any, renders the product defective, as that word is used in these instructions."

Goodrich urges that the failure to warn alone cannot constitute a defect within the meaning of the strict liability doctrine and that the instruction was based on an erroneous interpretation of *Canifax* v. *Hercules Powder Co., supra.* However, as we recently said in *Gherna* v. *Ford Motor Co.,* 246 Cal.App.2d 639, at page 651 [55 Cal.Rptr. 94], where, as in this case, there was evidence that the defendants knew of the danger and did not include any warnings relating thereto, "A manufacturer, as well as a dealer, must give adequate warning to the ultimate users of the product of any dangerous propensity which it knows or should have known would result

---

warranty causes of action to which contributory negligence is no defense (*Canifax* v. *Hercules, supra*; *Vassallo* v. *Sabatte Land Co.,* 212 Cal. App.2d 11, 18 [27 Cal.Rptr. 814]). The two New Jersey cases cited by Goodrich, *Cintrone* v. *Hertz Truck Leasing etc. Service,* 45 N.J. 434 [212 A.2d 769], and *Maiorino* v. *Weco Products Co.,* 45 N.J. 570 [214 A.2d 18], are not relevant as both involved negligence on the part of the injured party, independent of the use of the defective instrumentality. The record indicates that the court specifically instructed that Shirley's contributory negligence, if found, would bar any recovery on behalf of her heirs in the cause of action based on negligence, and that a manufacturer or seller of an article was entitled to assume that its product will be put to normal use and is not subject to liability where injuries or damages result from the misuse or abuse of the product.

in the type of accident that occurred [citation]. Nor can defendants be exonerated by the fact that the transmission fluid was manufactured by another party as Ford was aware of its highly volatile and flammable qualities and put its own label on it. As indicated by section 402 A of the Restatement Second of Torts, a product, although faultlessly made, may nevertheless be deemed 'defective' if it is unreasonably dangerous to place the product in the hands of a user without a suitable warning. . . .''

 In view of the evidence of Goodrich's asserted knowledge that the normal use of the vehicle with six passengers would result in an overload that would cause the tires to rupture and its admitted failure to issue any warnings concerning the overloading of the tires, the instruction was properly given.

2. Breach of Warranty.

 Goodrich argues that the court further erred in instructing on the issue of the breach of warranty of merchantability as this was not an issue pleaded in the case. This contention is without merit. The instructions complained of, set forth below,[4] were justified by the evidence and the allegations of the Barth and Clark causes of action for implied warranty, likewise set forth below.[5]

Goodrich further argues that since American had ordered ''two 8:00 x 14, black de luxe Silvertown'' tires by trade name, the implied warranty of fitness was precluded and that the court erred in submitting the issue to the jury. Goodrich relies on former section 1735 of the Civil Code,[6] which then

---

[4]''In a sale of goods such as the one which plaintiffs claim occurred in this case, there is an implied warranty that the goods shall be of merchantable quality. By this we mean that the goods shall be of ordinary quality reasonably suitable for the ordinary uses and purposes which goods of the general type described are manufactured or sold to meet.

''You are instructed that a party may recover for injuries proximately caused by a breach of warranty before the defect or condition constituting the breach was discovered or could have been discovered by him in the exercise of ordinary care.''

[5]''That at the time of the aforementioned sale of the aforementioned tire, defendants impliedly warranted to the purchaser of said tire that said tire was fit for its intended use and was free of defects in workmanship and material; that in fact said tire was not fit for its intended use and was not free of defects as aforesaid nor was it safe for use as a tire on a passenger automobile in that said tire was dangerous, defective and unsafe and as a result thereof failed, causing said automobile to leave the highway as aforementioned.''

[6]On January 1, 1965, this statute was superseded by section 2315 of the Commercial Code, which completely eliminated the trade name exception. The former statute, however, applies here.

provided, so far as pertinent: ''(4) In the case of a contract to sell or a sale of a specified article under its patent or other trade name, there is no implied warranty as to its fitness for any particular purpose.''

However, even under this statute, the mere description or ordering of an article by its trade name is not conclusive if other conditions exist that would raise an implied warranty of its character (*Odell* v. *Frueh*, 146 Cal.App.2d 504 [304 P.2d 45, 76 A.L.R.2d 345]). As stated in *Odell, supra*, at page 510, ''If the requisites of an implied warranty for a particular purpose are present—the vendor's knowledge of the special purpose and the vendee's reliance on his seller's judgment—the fact that the article sold is described by its trade-name does not prevent the imposition of a warranty obligation. . . . Subdivision 4 enacts only the truism that when a consumer purchases a branded item he is more likely to be relying upon his own judgment or the promotional effects of the manufacturer than upon the skill and judgment of his seller.''

In the instant case, where the purchase was made by American pursuant to its national arrangement with Goodrich to supply its fleets with tires, the prerequisites of implied warranty were clearly met and the trade name was used merely to identify the article (*Drumar Min. Co.* v. *Morris Ravine Min. Co.*, 33 Cal.App.2d 492 [92 P.2d 424]). Accordingly, the instructions given were correct and Goodrich's proffered instruction No. 24 on inapplicability of the implied warranty of fitness properly refused.

Goodrich also argues that the trial court erroneously instructed the jury that any warranty of the tires extended to the Clark plaintiffs. Goodrich contends that as to the Clark plaintiffs, who were passengers in the Barth vehicle, lack of privity of contract was an available defense of which it was erroneously deprived. As stated in the Restatement Second of Torts, page 354, under the doctrine of strict liability, it is not necessary that the ultimate user or consumer have purchased the product at all. He may be a member of the family of the final purchaser, or his employee or his guest. The liability is one in tort and does not require any contractual relation or privity of contract. This approach was adopted in *Vandermark* v. *Ford Motor Co.*, 61 Cal.2d 256 [37 Cal.Rptr. 896, 391 P.2d 168], where one of the plaintiffs who sued in breach of warranty was the sister of the owner-driver, and *Gutierrez* v. *Superior Court*, 243 Cal.App.2d 710 [52 Cal.

Rptr. 592], where the plaintiff guest of an inn was injured by the breaking of a glass door manufactured by the defendant. Furthermore, even prior to the adoption of the strict liability doctrine in this state, California courts held that the warranties would apply to the entire "industrial family" of an employer (*Peterson* v. *Lamb Rubber Co.*, 54 Cal.2d 339 [5 Cal.Rptr. 863, 353 P.2d 575]) and that in cases involving instrumentalities dangerous because of latent defects, implied warranties apply even in the absence of privity (*Alvarez* v. *Felker Mfg. Co.*, 230 Cal.App.2d 987 [41 Cal.Rptr. 514]).

■■■ We conclude that there were no errors in the warranty instructions given.

3. Negligence.

■■■ Goodrich next argues that the trial court also erred in instructing the jury that to avoid contributory negligence, one need be only ordinarily careful and prudent, as set forth in footnote[7] below. Goodrich cites no authority for its argument, and the instruction given was modeled on one approved verbatim in face of similar contentions in *Baillargeon* v. *Myers,* 180 Cal. 504, 516 [182 P. 37].

Finally, Goodrich argues that the court erroneously refused to instruct that the violation of the 65 mile-per-hour maximum speed limit created by section 22349 of the Vehicle Code would create a rebuttable presumption of negligence on the part of Shirley. The record indicates that the trial court, at the request of Goodrich, read to the jury the basic speed law (Veh. Code, § 22350) and specifically indicated that a violation of the basic rule constituted negligence. Goodrich complains that the court thereafter instructed the jury concerning the proper equipment of motor vehicles on the basis of section 26300 of the Vehicle Code and then stated that a violation of that section created a presumption of negligence, but failed to again specifically mention the effect of violating section 22349.

Rather than being prejudicial, we think the omission of the reference to section 22349 of the Vehicle Code was unduly favorable to Goodrich. The jury was told that driving a vehicle at a speed greater than 65 miles per hour was negligent as

---

[7]"You cannot find in this case that the decedent Shirley Sue Barth, or the plaintiff Theodore H. Barth, were or either of them was guilty of contributory negligence unless you believe from the evidence that said decedent or Theodore H. Barth did something which an ordinarily careful and prudent person, acting under the same or similar circumstances, would not have done, or failed to do something which an ordinarily careful and prudent person would have done under those circumstances."

a matter of law and that under no circumstances could a speed in excess of 65 miles an hour be justified. If the jury had been instructed, as Goodrich suggests, that the violation of the section only created a presumption of negligence that could be overcome by other evidence showing that the conduct was excusable or justified, Barth and Clark would have benefited and Goodrich clearly was not prejudiced.

We conclude that in view of the overwhelming evidence of the liability of Goodrich on the theory of strict liability alone, and the fact that there are no contentions concerning the sufficiency of the evidence, Goodrich has not met its burden predicating reversible error on the rulings of the trial court during trial and the instructions to the jury. We hold that the judgments in favor of Barth and Clark against Goodrich must be affirmed.

## II. THE BARTH AND CLARK CROSS-APPEAL

FACTS:

In October 1961, shortly after taking over the station wagon, Barth was informed by his predecessor that instead of following the former procedure of using credit cards for needed equipment on company cars, American had made arrangements with Goodrich, on a national basis, to furnish replacement tires, etc. for American's fleet of vehicles. On October 28, Barth wrote an interoffice memo to American's home office in Toledo, indicating that he needed two new tires and inquiring whether he should continue to drive the vehicle which then had 33,000 miles on it. He received a reply dated November 3 indicating that he should continue to drive the station wagon until the 1963 models came out and that two new tires had been ordered for him from Biltmore (a midwestern Goodrich distributor "who handles our tire business").

Barth also received a copy of a letter dated November 3 from American's Toledo office to Biltmore, asking Biltmore to issue a draw number to B. F. Goodrich in San Francisco, for two 800 x 14 black de luxe B. F. Goodrich Silvertown Rayon tubeless tires for the station wagon.

Shortly thereafter, Barth received a copy of Biltmore's draw order, dated November 6, indicating that the tires were to be picked up in San Francisco at Perry & Whitelaw. On November 9, 1961, an employee of American took the station wagon to Perry & Whitelaw who installed two tires from its stock on the rear wheels and provided a Goodrich form war-

ranty, including a warranty against blowouts, with its name and address stamped on it.

As a wholesale and retail Goodrich distributor, Perry & Whitelaw sold tires to individuals and serviced Goodrich's national fleet accounts. Some of these national accounts dealt directly with Perry & Whitelaw; others, like American, dealt through an intermediary, such as Biltmore, a midwestern Goodrich distributor, similar to Perry & Whitelaw.

Perry & Whitelaw had received the Biltmore draw order, advising them to release the tires to American. Perry & Whitelaw's invoice indicated that the tires were sold to Goodrich, were to be delivered to American, and charged to Biltmore. Perry & Whitelaw sent this invoice to Goodrich, who, in turn, billed Biltmore, and allowed Perry & Whitelaw a service charge for handling the transaction, as well as a credit for the tires removed from its stock. On national accounts, such as American, Perry & Whitelaw did not know the exact amount of this credit until informed of it by Goodrich, as the amount depended on the prices established by Goodrich with the home office of the national account.[8] In the instant case, Perry & Whitelaw received $4.13 for mounting the tires and a net credit of $40.08 for the tires.

For a national account like American, Perry & Whitelaw was required to obtain a draw order from Biltmore in order to obtain a credit for the tires taken from its stock. This procedure differed substantially from that followed in an individual transaction, where Perry & Whitelaw would measure the remaining tread, charge the customer for the tread used, give the customer a new tire, send the old tire to Goodrich and receive a credit from Goodrich for the difference between what it collected from the customer and its basic cost of the tire.

---

[8]The procedure is set forth as follows in the Goodrich Fleet Sales Manual issued to distributors: *"Fleet National Accounts.* Under this plan, all deliveries are invoiced by B. F. Goodrich Tire Company at prices established with the home office of the national account.

"B. F. Goodrich Stores and dealers are to bill their B. F. Goodrich Zone Office for all tires, batteries, or highway type retreads delivered to these Fleet National Accounts.

"Do not issue billing direct to the customer for merchandise delivered, and no charge is to be made for applying new tires or installing new batteries. However, solid tire press-on charges should be billed at the local rate as Industrial Solid tire prices to Fleet National Accounts do not include application. The usual rate is 75 cents per cross section inch.

"B. F. Goodrich Stores and dealers receive a sales and service commission for all new tires, batteries, and highway type retreads delivered to Fleet National Accounts. This sales and service commission pays the store or dealer for the normal service of mounting new tires and installing new batteries at the retailers premises."

250

 The only question on the cross-appeal is whether the trial court erred in instructing the jury as follows, at the request of Perry & Whitelaw: "Before strict liability in tort may be imposed against defendant Perry & Whitelaw, Inc., it must be proved by a preponderance of the evidence . . . not only . . . [that] the tire in question when placed on the market had a defect at that time, and that the defect, if any, was a proximate cause of the accident, but, also, that Perry & Whitelaw, Inc. sold the tire in question to the employer of Theodore Barth.

"A sale is a transfer or an agreement to transfer goods to a buyer for a price. In this case it is for you to determine whether the sale of the tire was made by Perry & Whitelaw, Inc., as seller, to the employer of Theodore Barth, as buyer, at the time and place alleged by the plaintiff."

Barth and Clark contend that these instructions constituted prejudicial error as the jury was left to determine the question of whether the particular transaction was a sale, and was told that unless they found a sale from Perry & Whitelaw, strict liability could not be imposed on Perry & Whitelaw.

The definition of a sale in the above quoted instruction is not in accord with the definition of a seller for the purpose of the doctrine of strict liability, adopted as the law of this state in *Greenman* v. *Yuba Power Products, Inc., supra,* and set forth in section 402 A of the Restatement Second of Torts, as follows: "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

 Comment f of the Restatement Second of Torts points out that as to the business of selling, the doctrine of strict liability applies to *any person engaged in the business of selling products for use or consumption therefore including any manufacturer, wholesaler or retail dealer or distributor as*

*well as operators of restaurants.* It is not necessary that the seller be engaged solely in the business of selling such products. The only group of persons exempted from the rule is the occasional seller who is not engaged in that activity as part of his business, like a housewife who, on occasion, sells to her neighbor a jar of jam or a pound of sugar. The Restatement comment further points out that the basis for the rule is the ancient one of the special responsibility for the safety of the public undertaken by one who enters into the business of supplying human beings with products that may endanger the safety of their persons and property and the forced reliance on that undertaking on the part of those who purchase such goods. ▆▆▆▆ Clearly, Perry & Whitelaw was a distributor within the Restatement definition of the term seller for the purpose of the application of the doctrine of strict liability and the instructions were erroneous.

Although there have been no cases directly in point in California, our view is in accord with the rationale for the doctrine of strict liability, set forth by our Supreme Court in *Vandermark* v. *Ford Motor Co., supra,* at pages 262 and 263: "Retailers like manufacturers are *engaged in the business of distributing goods to the public. They are an integral part of the overall producing and marketing enterprise* that should bear the cost of injuries resulting from defective products. (See *Greenman* v. *Yuba Power Products, Inc.,* 59 Cal.2d 57, 63 [27 Cal.Rptr. 697, 377 P.2d 897].) In some cases the retailer may be the only member of that enterprise reasonably available to the injured plaintiff. In other cases the retailer himself may play a substantial part in insuring that the product is safe or may be in a position to exert pressure on the manufacturer to that end; the retailer's strict liability thus serves as an added incentive to safety. Strict liability on the manufacturer and retailer alike *affords maximum protection to the injured plaintiff and works no injustice to the defendants,* for they can adjust the costs of such protection between them in the course of their continuing business relationship." (Italics supplied.)

Perry & Whitelaw argues that the instruction was proper as it was not a "seller" of the tire to American but only served as a conduit for the sale that was made by Goodrich through Biltmore to American; that the situation is analogous to a transaction where Perry & Whitelaw merely installed a tire ordered by a customer from another retailer or wholesaler. ▆▆▆▆ But neither the transfer of title to the goods nor a sale is

required. For example, in *Greyhound Corp.* v. *Brown* (1959) 269 Ala. 520 [113 So.2d 916], and *Gray Line Co.* v. *Goodyear Tire & Rubber Co.* (9th Cir. 1960) 280 F.2d 294, the bus company was allowed to recover damages from a tire supply company sustained as the result of a blowout of a tire owned by the tire company and placed on the bus by a tire supply company. In both of the above cases, the tires on the bus were furnished by the tire company to the bus company under the terms of a national agreement, under which title to the tire so supplied remained in the tire company. And, in *McKisson* v. *Sales Affiliates, Inc.* (Tex. 1967) 416 S.W.2d 787, the court said: "One who delivers an advertising sample to another with the expectation of profiting therefrom through future sales is in the same position as one who sells the product." (P. 792.)

 Perry & Whitelaw argues it merely installed the tires in question for the minor fee of $4.13 and realized no profit on the transaction. The uncontroverted evidence, however, indicates that its role was not that minor. As an authorized Goodrich distributor, Perry & Whitelaw benefited from servicing Goodrich's national accounts, like American, in addition to its other retail and wholesale business. The tire in question was removed from Perry & Whitelaw's stock of tires, and besides the installation fee, Perry & Whitelaw received a credit from Goodrich for the cost to it of the tire. In addition, Perry & Whitelaw stamped its name on the Goodrich form warranty.

The only significant difference between this transaction and the usual retail one, was the fact that Perry & Whitelaw did not know the exact amount of its credit at the time of the transaction, as this depended on the contractual agreement as to price made between Goodrich and American. *Clearly, Perry & Whitelaw was a part of the overall marketing enterprise for Goodrich tires.*

Furthermore, in the instant case, apart from Goodrich, Perry & Whitelaw was the only other party who had any knowledge or expertise as to the proper weight to be carried by the tires. It had access to the Tire and Rim Association manual as well as to other "service" publications and service briefings provided by Goodrich. However, Perry & Whitelaw never communicated any information of this kind to the public unless specifically asked.

We think that the reasons set forth in *Greenman, supra,* for applying the doctrine to the retailer apply to a distributor and supplier such as Perry & Whitelaw. As indicated in

*Greenman*, the reasons for placing losses due to defective products on the manufacturers and suppliers are to provide maximum protection for the consumer and the fact that the overall producing and marketing enterprise is in a better position to insure against the liability and to distribute it to the public by adding the cost thereof to the price of the product. As pointed out by one eminent commentator (Prosser, *Strict Liability to the Consumer in California*, 18 Hastings L.J. 9, 20) : ''The rationale of risk spreading and compensating the victim has no special relevancy to cases involving injuries resulting from the use of defective goods. The reasoning would seem to apply not only in cases involving personal injuries arising from the *sale* of defective goods, but equally to any case where an injury results from the risk creating conduct of the seller *in any stage of the production and distribution of goods*'' (italics partially supplied; fn. 62). (See also, R. Steffen, *Enterprise Liability : Some Exploratory Comments*, 17 Hastings L.J. 165).

Our view that as a distributor and supplier, Perry & Whitelaw was strictly liable to the consumer and ultimate user, is also supported by the decisions of our Supreme Court, a pioneer in the development of the law of products liability. It is established that a wholesaler distributor who neither manufactures the product nor has possession of the goods can be held to the doctrine of strict liability (*Canifax* v. *Hercules Powder Co., supra*). In *Martinez* v. *Nichols Conveyor etc. Co.*, 243 Cal.App.2d 795, 799 [52 Cal.Rptr. 842], a sister appellate court assumed that the rule also applies to lessors and bailors, citing *Cintrone* v. *Hertz Truck Leasing etc. Service, supra*).[9]

Several recent decisions in other jurisdictions have also followed the suggestion that all suppliers in the chain of getting goods from the manufacturer to the consumer should be held

---

[9]After taking judicial notice of the growth of the business of renting motor vehicles, trucks and pleasure cars, the court pointed out that the nature of the U-drive enterprise was such that a heavy burden of responsibility for the safety of lessees and for members of the public had to be imposed on it. The court said at pages 777 and 778: ''A bailor for hire, such as a person in the U-drive-it business, puts motor vehicles in the stream of commerce in a fashion not unlike a manufacturer or retailer. In fact such a bailor puts the vehicle he buys and then rents to the public to more sustained use on the highways than most ordinary car purchasers. The very nature of the business is such that the bailee, his employees, passengers and the traveling public are exposed to a greater *quantum* of potential danger of harm from defective vehicles than usually arises out of sales by the manufacturer. We held in *Santor* the liability of the manufacturer might be expressed in terms of strict liability in tort.

(see Prosser, 50 Minn. L.Rev. 791). For example, in *McKisson* v. *Sales Affiliates, Inc., supra,* the plaintiff's wife owned a beauty shop and received from the salesman of the distributor a sample of its permanent wave preparation. After she sustained injuries resulting from the use of the preparation on her own hair, her husband filed an action against the distributor of the product. The court held that the distributor was liable under the doctrine of strict liability, citing section 402 A of the Restatement Second of Torts. In *McKee* v. *Brunswick Corp.* (7th Cir. 1965) 354 F.2d 577, the seller of a boat, as well as the designer and manufacturer thereof, and the manufacturer and supplier of an ignition coil that subsequently proved defective, were all held liable under the doctrine of strict liability to the passengers of the owner of the private pleasure boat which exploded.

In *Blitzstein* v. *Ford Motor Co.* (5th Cir. 1961) 288 F.2d 738, the plaintiff purchased an English Ford automobile from a dealer in Birmingham, Alabama. After an explosion that occurred when he turned on the ignition, he brought suit against the English manufacturer and the American distributor in Dearborn. The federal court, following Alabama law, had no jurisdiction over the English manufacturer, but reversed a verdict in favor of Ford, the American distributor in Dearborn, as the jury could reasonably have found that the American Ford Company was negligent in marketing a product that was inherently dangerous.

The judgments in favor of Perry & Whitelaw against Barth and Clark are reversed, and the judgments in favor of Barth and Clark against Goodrich are affirmed. Plaintiffs to recover costs on appeal.

Shoemaker, P. J., and Agee, J., concurred.

The petition of the defendant and respondent for a hearing by the Supreme Court was denied October 23, 1968.

---

*Santor* v. *A. & M. Karagheusian, Inc., supra,* (44 N.J. at 66-67, 207 A.2d 305); see also, Restatement (Second), Torts, § 402A, comment m, pp. 9-10 (Tent. Draft No. 10, 1964). By analogy the same rule should be made applicable to the U-drive-it bailor-bailee relationship. Such a rental must be regarded as accompanied by a representation that the vehicle is fit for operation on the public highways.''