[Crim. No. 4628. First Dist., Div. Three. June 22, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. JOE ELMER DAVIS, JR., Defendant and Appellant.

Alex L. Arguello, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., and Derald E. Granberg, Deputy Attorneys General, for Plaintiff and Respondent.

SALSMAN, J.—Appellant Joe Elmer Davis, Jr. was convicted after trial by jury of murder in the first degree and burglary in the first degree.

On appeal appellant questions the legality of search and seizure, the propriety of certain cross-examination, the admissibility of evidence, and further asserts that his constitutional rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution were violated by police interrogation.

The record supports the following statement of facts. On June 27, 1963, at about 2:20 a.m., the body of Mrs. Rosa Fudel was discovered in her bedroom at her home at 75 Olive Court, Mountain View, by a tenant, Mr. Raymond Hill.

Mrs. Fudel's body was lying on the bed. Her head was for the most part blown away by a bullet which had first passed through her right arm. The fatal bullet, fired from a 30.06 rifle, also passed through the mattress and the headboard of the bed and lodged in the wall.

There was no sign of forced entry and no weapon or cartridge casings were found.

Mrs. Fudel had been taking dancing lessons at an Arthur Murray Dance Studio. Appellant was one of her dance instructors. Mrs. Fudel was also a member of the Guys and Gals Club, a social organization which met on Wednesday nights at a place called the Chalet in Belmont for dancing to Latin music. Mrs. Fudel attended regularly on Wednesday nights. She had attended the Wednesday meeting of the club on June 19, 1963, just a week before her· death.

The examining pathologist fixed the time of Mrs. Fudel's death at between 10 p.m. on June 26, 1963 (Wednesday) and 1 a.m. on June 27, 1963.

At about 10:30 or 10:45 p.m. on the 26th, neighbors of Mrs. Fudel had heard a noise which they described variously as a "small explosion," a "backfire," a "bang or shot," or a "bang which sounded like a loud, very loud shot." About half a minute later a car started up and a 1956 Ford station wagon was observed driving from the cul-de-sac on which the Fudel residence was located and turning onto Church Street. The car had a red roof, white-trimmed windows and a red body. The only person in the car was the driver. The vehicle had a very loud muffler system.

After learning of the murder, Mountain View police contacted and interviewed Mr. Fred Fudel, the victim's husband, and then Mary Jane Barber, one of the victim's friends. On the afternoon of the 27th, they went to the Arthur Murray Studio where they talked to the owner and an instructor. The officers, including Officer O'Conner,[1] proceeded to appellant's apartment at 3486 Rollison Road in Redwood City, arriving about 7 p.m. on the 27th.

In the apartment house parking area the police observed a red and white 1956 Ford station wagon. It was registered to appellant. In checking underneath it, they observed that the left exhaust pipe was faulty and that the right muffler had a large hole in it.

The officers then went to appellant's apartment, knocked at the door, and when he opened it, asked if they could talk to him. Appellant agreed and asked them to step in. The officers entered, identified themselves, sat down and began the interview. They asked appellant about his activities the night before. He said he was home all evening except when he took his wife to work and picked her up.

While talking to appellant, the officers noted that some of the furniture—a coffee table and two end tables with marble tops—resembled furniture taken in the burglary of Mrs. Fudel's home on April 26, 1963. When appellant was asked where he had obtained the furniture, he replied it was from the Town and Country Village on Stevens Creek Road in San Jose. In looking underneath one of the tables, the officers noted a sticker from the manufacturer to Will Hearne, Palo Alto, California. They then asked appellant to accompany them to the Mountain View Police Department for a further interview.

---

[1] Officer O'Conner of the Redwood City Police Department, knowing of the investigation, asked to be assigned to assist since he had some slight acquaintance with appellant.

At the Mountain View Police Department appellant was asked again about the Fudel furniture found in his apartment. He repeated he had gotten it at the Town and Country Village. Appellant's wife arrived at the police department about 8:20 p.m. and the police also talked to her about the furniture. After appellant's wife told him to tell the truth, he said he had purchased the furniture from a Mike Tefft for $45. He said Tefft had been a dance instructor at the Arthur Murray Studio, and that he had told him the furniture had been taken in the burglary of Mrs. Fudel's home.

Appellant and his wife said they wanted no part of the stolen furniture and that the officers could retrieve it. Mrs. Davis accompanied some of the officers back to the apartment, and appellant's station wagon was volunteered by Mrs. Davis for use in transporting the furniture.

While the furniture was being retrieved, other officers took a tape-recorded statement from appellant in which he told of purchasing the furniture from Mike Tefft, knowing it had been taken from Mrs. Fudel's home. But he said he was not aware he was breaking the law or that he could get into trouble buying stolen property.

Appellant was also asked about his activities on the evening of June 26th. He said he had taken his wife to work at the Embers in Redwood City, leaving home about 7:40 p.m. and returning shortly after 8 p.m.; that he cleaned house, put the children to bed, did the laundry, watched television, and about 12:45 a.m. left for the Embers. He also said he had never owned or fired a .30 caliber weapon.

Shortly after appellant and the officers had arrived at the police department on the 27th, appellant had been asked to deposit the contents of his pockets on a table. Among the contents was a key which one officer compared with a key he had which he knew fitted the locks at the Fudel residence. Appellant, when asked about the key, stated it fitted the locks at an apartment where he used to live.

Appellant was released by the police on the evening of the 27th. He said he had seen Mike Tefft within the past two weeks, that he thought he knew where he could locate him, and that he would assist the police in locating Tefft.[2]

On the following day, the 28th, the police went to appellant's apartment at about noon. Later in the afternoon he

[2]There was evidence that during the times when the Fudel burglary and the murder of Mrs. Fudel occurred, Michael Tefft was living in New York. He had not lived in California since October of 1961.

was taken to the sheriff's office in San Mateo and placed under arrest.

After appellant had been taken to the sheriff's office, one of the police officers contacted Mr. and Mrs. Densley, the persons who managed the apartment building in which appellant lived. Mr. and Mrs. Densley occupied apartment number 10 which was adjacent to number 9, appellant's apartment. On the 9th or 10th of June, 1963, while the Densleys were on vacation, their apartment had been entered and ransacked, and Mr. Densley's 30.06 rifle, a Remington model 760 pump, had been taken. He had not seen it since that time.

Also on the 28th, the police conducted a search of appellant's apartment pursuant to a search warrant. At the same time, they seized and searched appellant's car. In the course of the search of the apartment, the police found an electric razor which had been taken from the tenant's room during the April 26th burglary of Mrs. Fudel's home. In a linen closet they found some paper targets, some of which had holes about the size that would be made by .30 caliber ammunition.

During the evening of the 28th appellant was asked about a hole in the side of his station wagon. Appellant said it had been made by an accidental discharge of his .410 shotgun and that it had occurred in the parking lot of the Arthur Murray Dance Studio. An examination of the parking lot produced no evidence of pellet marks from the discharge of a shotgun. However, there was such evidence at the home of Mr. and Mrs. LeBeau, who were neighbors of Mrs. Fudel.

Appellant had purchased the .410 shotgun on June 18, 1963. On the evening of June 19, 1963, the LeBeaus had observed a red and white station wagon parked in front of their home. While the car was there, there had been a noise like a group of pebbles or stones thrown at the dining room window, or like BB's or pellets striking the glass. When Mrs. LeBeau went to the window, she observed the car driving away. Pellets and wadding from a shotgun shell were found at the LeBeau home.

On June 29th, appellant was taken by the police to the Fudel residence. While there they showed him that the key he had turned over to them on the 27th operated the front door lock at the Fudel residence. The police had earlier ascertained it would operate the lock at the Fudel residence

and that it would not operate the lock at the apartment where appellant had said he used it.

While at the Fudel residence on the 29th, appellant was asked when he had last been there, and he stated the prior week on Wednesday (the 19th) or Thursday (the 20th). He said he had been there to sell Mrs. Fudel a painting; that she paid $140 for the painting, and had given him a check for that amount. A cancelled check dated June 20th, 1963, in the amount of $140, and purporting to bear the signature of Rosa Fudel, was found on June 27, 1963. The endorsement was by appellant and the signature of Rosa Fudel was a forgery, accomplished by a tracing technique. At trial appellant acknowledged preparing and cashing the check.

While at the Fudel residence on the 29th appellant was once more asked if he had ever had or fired a .30 caliber rifle. He said he had not.

Continuing their investigation, the police were able to locate a tree near Sonora at which Mr. Densley had fired his rifle before it had been stolen from him in June of 1963. Some bullets embedded in the tree were recovered.

On June 23rd appellant was seen at the Sunnyvale Rifle Range, firing a Remington 30.06 rifle. The police secured a quantity of bullets at the rifle range, from the lane where appellant was seen firing a rifle. It was established that Mr. Densley had never fired his rifle at the Sunnyvale Rifle Range.

After comparing the fatal bullet with a bullet recovered from the tree near Sonora and with two bullets recovered from the Sunnyvale Rifle Range, a police ballistics expert concluded they had been fired from the same 30.06 rifle, a rifle which had the class characteristics of the Remington model 760.

 There is no merit to appellant's first contention that it was error on the part of the trial court to admit into evidence the furniture taken in the burglary of Mrs. Fudel's home and later found at appellant's apartment. The essence of this contention is that the officers gained entry to appellant's apartment by trick or device, thus rendering inadmissible any evidence discovered in this manner. It is of course a long settled rule that "an entry obtained by trickery, stealth or subterfuge renders a search and seizure invalid." (*People* v. *Roberts,* 47 Cal.2d 374, 378 [303 P.2d 721]; *People* v. *Reeves,* 61 Cal.2d 268, 273 [38 Cal.Rptr. 1, 391 P.2d 393], and cases cited.) But that rule has no application to the facts here. All that appears here is that Officer O'Conner who had a

very slight acquaintance with appellant, asked to be assigned to accompany the Mountain View officers in their interview with appellant. It is true that Officer O'Conner knocked on appellant's door and spoke to appellant. There is testimony that appellant invited the officers to enter the apartment. No trickery or subterfuge was involved. The fact that appellant and Officer O'Conner were casually acquainted was obviously not a factor in inducing appellant to invite the officers in, because appellant did not recognize Officer O'Conner until after the officers had entered pursuant to appellant's invitation. ▉ Thus, since appellant freely consented to the entry by the officers, his constitutional rights were not violated. (*People* v. *Michael,* 45 Cal.2d 751, 753 [290 P.2d 852].) The stolen furniture was in full view in the living room. Its discovery involved no search, and its seizure violated no right of appellant here. (*People* v. *Michael, supra,* 45 Cal.2d 751, 753; *People* v. *Norton,* 209 Cal.App.2d 173, 176-177 [25 Cal.Rptr. 676].)

▉ Appellant also argues that the key to the Fudel residence, taken from him under the circumstances shown in the statement of facts herein, was obtained by an illegal search and seizure. This argument cannot successfully be maintained here. During appellant's interrogation at the police department he was asked to empty his pockets and place the contents on a table. He did so. The trial court found that this was done voluntarily. The evidence supports that finding. When appellant was asked to empty his pockets, he was not under arrest, or charged with any offense. He was cooperating fully with the police in the investigation, although as it later developed, such cooperation was for the purpose of directing suspicion away from himself. He was released after giving a statement to the officers. Thus the trial court was fully justified in its finding that appellant produced the key voluntarily, and that it was not obtained by the officers as the result of an illegal search. Since no element of coercion was involved the evidence was admissible. (See *People* v. *Michael, supra,* 45 Cal.2d 751, 753.)

Appellant next contends that his automobile was illegally seized and that certain evidence relating to the vehicle should have been excluded. The evidence referred to here is testimony relating to a hole in the door of the vehicle, the angle of a probe placed in that hole, and its relationship to shotgun pellet marks on the sidewalk in front of a house near the Fudel residence. Also assigned as error is the testimony of

Mrs. LeBeau identifying appellant's car, given after she had observed officers drive the car past her home.

Before trial appellant made a motion to suppress certain evidence. Pursuant to this motion, Judge DeMarco made an order suppressing evidence taken from the car on June 27th, prior to appellant's arrest. The judge further ruled that seizure of appellant's car on June 28th was not proper, apparently upon the ground that, at the time of seizure, the officers possessed only a warrant authorizing search of the vehicle. Judge DeMarco's order also declared that the results of certain tests made by prospective witnesses, presumably relating to the hole in the door of the vehicle and the angle of a probe placed in the hole, could not be admitted as evidence. But at the same time he declined to suppress the testimony of police officers concerning their observations of the car. The order further declared that the car itself was not suppressed from evidence because it was an item of evidence.

The propriety of the court's order suppressing the evidence related may be open to some question, except for that portion of the order suppressing evidence obtained by a search of appellant's vehicle at a time when the officers did not have reasonable cause to arrest him. But we need not pass upon the propriety of the order. It is sufficient answer to appellant's objection to point out that Judge DeMarco's order was carefully obeyed by the prosecution, and hence appellant is in no position to claim prejudice. Of course, the testimony of any witness relating to his personal observation of appellant's vehicle before its seizure by the officers was admissible, if relevant to any issue in the case.

 Appellant's objection to the testimony of Mrs. LeBeau cannot be sustained. This witness testified in effect that a red and white vehicle had left the scene of the murder shortly after the crime was committed. After appellant's car was seized it was driven past the home of the witness by the police for the purpose of allowing the witness to observe it. Appellant contends that the effect of this demonstration was to bolster the recollection of the witness and make her trial testimony stronger than it otherwise might have been. There is some merit to this contention, but even so, it is addressed primarily to the weight to be given to the testimony rather than to its admissibility. Appellant had full opportunity to cross-examine the witness and to argue the weight of such

testimony to the jury. We find no error in the admission of this evidence.

▮▮▮ Appellant also contends that the evidence concerning the Densley gun was speculative and irrelevant and should not have been admitted at his trial. Its effect, it is urged, was to permit the jury to draw improper inferences, and to base one inference upon another, to appellant's prejudice. We find no error in allowing this evidence to be presented to the jury.

It was the theory of the prosecution that appellant had murdered Mrs. Fudel and that the Densley gun was the murder weapon. To establish these conclusions in the minds of the jurors it was of course necessary to rely entirely upon circumstantial evidence, because there were no eyewitnesses to the commission of the crime and the Densley gun was never found. The fatal bullet was recovered, however. It had its story to tell, intelligible to experts, if not to laymen. It was identified as a 30.06 caliber bullet, one that could have been fired from a Remington 30.06 model 760 rifle. As previously noted, Mr. Densley's apartment had been burglarized about three weeks before Mrs. Fudel's murder, and his Remington 30.06 model 760 rifle had been taken in the burglary. Mr. Densley had fired his rifle at a tree in the mountains near the city of Sonora. A bullet taken from the tree had a story to tell also. It was of 30.06 caliber and had been fired from a Remington model 760 rifle or a gun of similar type. Experts concluded that the bullet taken from the tree was fired from the same gun as the bullet that killed Mrs. Fudel. From this evidence the jury could reasonably infer that the Densley gun was the murder weapon.

Other circumstantial evidence, together with inferences reasonably drawn therefrom, connects appellant with the lethal weapon. That evidence was this: three days before Mrs. Fudel's murder, appellant was seen at the Sunnyvale Rifle Range firing a 30.06 rifle, similar to a Remington model 760. Police investigation recovered bullets at the rifle range from the lane where appellant was seen firing a 30.06 rifle. Two of the bullets recovered were identified by experts as having been fired from the same rifle that discharged the bullet that killed Mrs. Fudel and that sent the bullet into the tree near Sonora. It was established that Mr. Densley had not fired his rifle at the Sunnyvale Rifle Range. From this evidence the jury could reasonably infer that appellant was firing the Densley rifle at the Sunnyvale Rifle Range three days before the murder of Mrs. Fudel.

Appellant challenges the final inference obviously drawn by the jury, namely, that it was appellant who killed Mrs. Fudel, using the Densley rifle. Admittedly this inference is based in part on the other inferences noted. Appellant concedes that, under some circumstances, one inference may properly be based upon another inference drawn from circumstantial evidence (*Vaccarezza* v. *Sanguinetti,* 71 Cal.App. 2d 687, 698 [163 P.2d 470], and cases cited), but contends that here such an inference is too remote and speculative to be sustained. We cannot agree. ■ It is now well established that one inference may be based on another inference where the first inference is properly drawn from sufficient evidence, and the second inference is not too remote or speculative. (*West Coast Life Ins. Co.* v. *Crawford,* 58 Cal.App.2d 771 [138 P.2d 384]; *People* v. *Graves,* 137 Cal.App. 1 [29 P.2d 807, 30 P.2d 508]; *Brown-Forman D. Corp.* v. *Walkup etc. Co.,* 71 Cal.App.2d 795, 799 [163 P.2d 878]; *People* v. *Vignoli,* 213 Cal.App.2d 855 [29 Cal.Rptr. 260]; Witkin, Cal. Evidence (1958) § 121, p. 145.) ■ Here the jury not only possessed the circumstantial evidence relating to appellant's possession of the Densley gun and the identity of that gun as the murder weapon, but also was aware of all the other circumstantial evidence concerning appellant's relationship with Mrs. Fudel, his possession of the furniture stolen from her home, and the further evidence of the presence of his vehicle near her home on the night of her murder. Thus the final inference was entirely reasonable and cannot be faulted on the ground that it is either remote or conjectural.

Appellant contends further that the People's cross-examination violated his privilege against self-incrimination. As we have noted, appellant was charged both with murder and burglary. ■ He testified in his own behalf but carefully limited his testimony to matters relating to the murder. On cross-examination, over appellant's objection, the prosecution was permitted to inquire of appellant concerning the burglary of Mrs. Fudel's home on April 26th. Appellant admitted being in the Fudel residence on April 26th and also that he had removed various items of furniture and silverware from the premises.

We think the cross-examination was proper. ■ Although it is the general rule that the cross-examination is limited by the scope of the direct examination (Pen. Code, § 1323) this does not mean that where, as here, a defendant

takes the stand and makes a denial of the charge against him, his cross-examination must be limited to a review of the dates, times and matters referred to in the direct examination. (*People* v. *Zerillo,* 36 Cal.2d 222, 228-229 [223 P.2d 223].) On the contrary, in such a case, the scope of cross-examination is very wide, and may exceed in area the matters covered by the direct examination. (*People* v. *Teshara,* 141 Cal. 633, 638 [75 P. 338]. See also *People* v. *Pike,* 58 Cal.2d 70, 90 [22 Cal.Rptr. 664, 372 P.2d 656]; *People* v. *Weiss,* 50 Cal.2d 535, 561 [327 P.2d 527]; *People* v. *Watson,* 46 Cal.2d 818, 832 [299 P.2d 243].) ▆ Moreover, even if appellant's cross-examination was improper, it was not prejudicial. There was a great deal of testimony concerning appellant's possession of the furniture stolen from Mrs. Fudel's home. Appellant's story concerning the purchase of the furniture from one whom he named as the actual thief was entirely contradicted. The jury could reasonably find that appellant's account of his possession of the furniture was false. ▆ Possession of recently stolen property, coupled with a false explanation of such possession is sufficient to support a conviction for burglary. (*People* v. *McFarland,* 58 Cal.2d 748, 754-755 [26 Cal.Rptr. 473, 376 P.2d 449].) ▆ Here the evidence, aside from appellant's cross-examination, was sufficient to support his conviction for burglary and hence any error that may have occurred in his cross-examination did not prejudice him.

Appellant's final contention is that evidence concerning his statements to the police was permitted in violation of his constitutional rights under rules declared in *Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], and *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. This contention too must be dismissed.

▆ Appellant's first discussion with the police was at his home on June 27th. The statement of facts previously given shows that, at the time these statements were made, the police had justification for their interview with appellant, but suspicion had not yet focused upon him as the prime suspect. He was not in custody. Police inquiry was not directed towards obtaining a confession or even admissions concerning the crime. It is clear, therefore, that the accustory stage of the proceedings, as delineated in *People* v. *Dorado, supra,* and *Escobedo* v. *Illinois, supra,* had not been reached. There was no error therefore in the admission of

that testimony. (See also *People* v. *Bilderbach,* 62 Cal.2d 757, 761 [44 Cal.Rptr. 313, 401 P.2d 921].)

Appellant's second statement was made to the authorities on June 27th at the Mountain View police station. There was no prejudicial error in receiving this evidence. Appellant was not under arrest. He had been told by the police that he could decline to make any statement if he wished to do so. He made no confession. Some of his statements later were proved to be false. It is clear from the record, however, that at the time appellant gave this statement his purpose was to evidence complete cooperation with the authorities, to excuse himself from involvement in the events under investigation, and to shift suspicion to others, particularly Mike Tefft, who was suggested to be the actual burglar of the Fudel home. After recording his statement, appellant left the police station and returned to his home. Officer Tomac testified that appellant was ''allowed to go'' because the investigation was continuing; that the police felt it necessary to locate Mike Tefft, and that appellant had offered to assist in that endeavor.

We do not think admission of these statements into evidence, made under the circumstances recited, violates the rule of *Dorado.* (See also *People* v. *Stewart,* 62 Cal.2d 571, 578-579 [43 Cal.Rptr. 201, 400 P.2d 97].)

Although appellant does not urge the point, we note in the record that the trial court instructed the jury in substantially the same language as that condemned in *Griffin* v. *California,*[3] 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106]. The instruction should not have been given here. Nevertheless, we see no prejudice to appellant. Appellant did not remain silent. He took the witness stand and testified at length. He did his best to explain the evidence against himself and entered an explicit denial of the homicide. As we have noted there was ample evidence implicating him in the burglary with which he was charged. Under these circumstances we do not think the rule of *Griffin* compels reversal. (See *People* v. *Bostick,* 62 Cal.2d 820 [44 Cal.Rptr. 649, 402 P.2d 529].)

Judgment affirmed.

Draper, P. J., and Devine, J., concurred.

[3]Filed April 28, 1965.