[Crim. No. 3340.    Fourth Dist., Div. Two.    Mar. 21, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. ROY HANSEL
WARNER, Defendant and Appellant.

Robert J. Simpson for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Mark L. Christiansen, Deputy Attorney General, for Plaintiff and Respondent.

TAMURA, J.—Following a jury trial defendant was found guilty of conspiracy to commit bookmaking, pronouncement of judgment was withheld and he was granted probation subject to certain terms and conditions. Defendant appeals from the order granting probation and also purports.to appeal from the "judgment." Judgment not having been pronounced, the purported appeal therefrom must be dismissed. (*People* v. *Jones*, 36 Cal.2d 373, 375 [224 P.2d 353].)

The indictment on which defendant was tried included four others (Clyde Clark, Clarice Jeannie Clark, David Simons, also known as David L. Scott, and Patricia Martin.) Clyde Clark and David Simons plead guilty and were the principal witnesses for the prosecution.

Defendant is a boxing and wrestling promotor and owner of the Main Event Bar in San Bernardino. Clyde Clark was a former police officer of the City of San Bernardino. In February 1967 he was an employee of a private detective agency and was assigned on certain nights as a security officer at defendant's bar. On February 15 defendant told Clark that he knew a person who was willing to finance a bookmaking operation in San Bernardino and asked whether he was interested. About a week later, following a purported conversation with Officer Powers of the San Bernardino Police Department with whom he had served, Clark told defendant that if he would finance the operation, he [Clark] would arrange for police protection. A few days later defendant asked Clark to accompany him to Los Angeles to meet some people who were interested in the venture.

On February 23 the two drove to an actor's home in Beverly Hills where they met Casey Tibbs and David Simons; Tibbs was a rodeo rider with whom defendant was acquainted and Simons was purportedly an experienced bookmaker. The

group discussed the prospects of a successful operation in the San Bernardino area. Clark indicated that he could arrange for protection; defendant stated that by reason of his wide acquaintance in the area he could provide players; and Tibbs and Simons offered to raise money to finance the venture. It was agreed that defendant and Clark would each receive 6 percent of the net profits plus $200 per week, and that $200 per week would be appropriated for protection. The group agreed to meet the following Monday at the Main Event Bar and then look for an apartment where the operation would be conducted.

The following Monday defendant, Clark, Simons and Tibbs met at the Main Event Bar and left immediately in Simon's car in search of an apartment. They found a suitable apartment, defendant was returned to the bar, and the others went to the realtor and rented the apartment.

Clark was to arrange for telephone service in the name of "David Scott" (Simons) but was unable to do so because Simons did not have credit. Pursuant to Clark's request, Simons, who was then still residing in Los Angeles, came to San Bernardino and he, defendant and Clark went to the telephone company. Simons had difficulty in establishing his credit so defendant requested to see the manager. The manager told defendant that if he would guarantee payment of the bills, service would be recommended. Defendant agreed and co-signed for the service. The telephone was installed on March 7.

Following installation of the telephone Simons occupied the apartment during the day and accepted bets. He set up a system whereby bettors were assigned numbers so that a person calling to place a bet would give his number, Simons would check it against his list of assigned numbers and, if the number given was on the list, the bet would be taken. Simons would meet the players once a week; if they won, he would pay them off, and if they lost he would collect. Clark and Simons were each assigned a number.

Meanwhile Clark contacted Officer Powers to arrange protection. Powers reported the matter to his superiors and was instructed to continue meeting with Clark. At one of the meetings Clark paid Powers $50 and in the course of another meeting, when Powers indicated that he had to know the names of the persons involved in order to provide police protection, Clark revealed the names of the individuals including that of defendant.

Two other officers assigned to assist in the investigation met Mrs. Clark and Patricia Martin in a restaurant and were given telephone numbers to call to place bets. One was that of the apartment and the other of Clark's residence. The officers subsequently placed bets by calling the numbers given them.

Defendant took the stand and denied approaching Clark on the subject of bookmaking, denied ever going to the actor's home in Beverly Hills with Clark and denied accompanying Clark, Simons and Tibbs in search of an apartment. His explanation for co-signing for the telephone service was as follows: Clark told him that he had rented an apartment in which to conduct a babysitting service, that Simons was to live in the apartment temporarily while assisting Clark in a business survey for realtors, and that he [Clark] was having difficulty obtaining telephone service. Defendant accompanied Clark and Simons to the telephone company and while they were waiting to see the manager, Simons made a telephone call and requested defendant to speak to the party on the line. The other party was Tibbs who requested defendant to co-sign for the service for Simons.

Defendant testified that on March 11 Clark told him that arrangements had been made for police protection and requested him to produce players but that he refused to become involved; that several days later Clark stated that since defendant had co-signed for the telephone service, he was as "guilty" as Clark and threatened to "break" the Warners unless defendant joined the conspiracy; that despite the threats defendant refused to become involved even to the extent of visiting the apartment where bookmaking was being conducted; and that following his refusal, Clark's attitude towards defendant became cold and indifferent.

In rebuttal, the prosecution was permitted to introduce, over defendant's objections recorded telephone calls made by defendant's wife to Clark's apartment immediately following defendant's arrest. The calls were recorded by officers who had arrested Clark and his wife. Upon entering and making the arrest, the officers attached an induction coil and recording device to the telephone. When the telephone rang, one of the officers answered. A female voice later identified as that of Mrs. Warner asked whether it was "Clyde" and the officer answered in the affirmative. Mrs. Warner then asked whether anyone else was present and whether the phone was tapped. She then stated that her husband had just been arrested for bookmaking and continued, "I'm on my way up there now

with the checkbook and everything, so watch your damn step and find out what the hell's going on.'' A short time later Mrs. Warner called again and asked ''Clyde?'' to which the officer replied, ''No.'' Mrs. Warner nevertheless proceeded to ask, ''You find out anything?''; stated that the police had taken her husband; that the bail was set at $5,500; that her husband told her to call ''and let you know and see what you could find out''; and concluded by saying, ''Get your ear to the ground, buddy, and find out who in the hell's doing what, who the stool pigeon is.''

Mrs. Warner was called by the defense to explain the calls. She testified that when she was notified of her husband's arrest, she called Clark immediately because she had been told that he had threatened to ''break them'' and was concerned that he may have been responsible for her husband's arrest.

■ Defendant's principal contentions are that the court erred in permitting the prosecution to introduce Mrs. Warner's recorded telephone calls into evidence because (a) the evidence was improperly offered in rebuttal; (b) the evidence constituted inadmissible hearsay; (c) the recordation of the calls violated Mrs. Warner's Fourth Amendment rights. The contentions are nonmeritorious.

The evidence was properly received in rebuttal. The order of proof rests largely in the sound discretion of the trial court. (Evid. Code, § 320; Pen. Code, §§ 1093, subd. 4, 1094; *People* v. *Pike*, 58 Cal.2d 70, 93 [22 Cal.Rptr. 664, 372 P.2d 656]; *People* v. *Wein*, 50 Cal.2d 383, 407 [326 P.2d 457].) The fact that the evidence may have tended to support the People's case in chief did not render it improper rebuttal evidence. (*People* v. *Pike, supra,* 58 Cal.2d 70, 92.) Unlike *People* v. *Carter*, 48 Cal.2d 737 [312 P.2d 665], cited by defendant, where crucial evidence connecting defendant with the crime charged was withheld by the prosecution for rebuttal, evidence of Mrs. Warner's calls was not crucial to the People's case in chief. As will be presently shown, the evidence was properly received to discredit defendant's testimony concerning the nature of his relationship with Clark.

■ Defendant argues that the evidence was inadmissible under the exception to the hearsay rule permitting declarations of a co-conspirator made during the existence of and in furtherance of a conspiracy to be received against a co-conspirator. (Evid. Code, § 1223; *People* v. *Ferlin*, 203 Cal. 587, 599 [265 P. 230]; *People* v. *Morales*, 263 Cal.App.2d 368, 373 [69 Cal.Rptr. 402]) because the requirement that

there be some independent evidence that the declarant was a co-conspirator was not met (Evid. Code, § 1223, subd. (c); *People* v. *Ferlin, supra; People* v. *Morales, supra*). The argument erroneously presupposes that the recorded calls were received to prove the truth of the matters therein asserted.

Mrs. Warner's calls were obviously not offered to prove the truth of the matters asserted, e.g., that defendant was in fact arrested or that bail had been set for $5,500. The evidence was offered to show that defendant's wife called Clark immediately after defendant's arrest and held a conversation with a person whom she thought was Clark. Such evidence is not hearsay. (Evid. Code, § 1200; *People* v. *Gonzales,* 68 Cal.2d 467, 471-472 [67 Cal.Rptr. 551, 439 P.2d 655]; *Rogers* v. *Superior Court,* 46 Cal.2d 3, 8 [291 P.2d 929]; *People* v. *Carella,* 191 Cal.App.2d 115, 139 [12 Cal.Rptr. 446]; *People* v. *Henry,* 86 Cal.App.2d 785, 789 [195 P.2d 478].) In a bookmaking case, evidence of a telephone conversation between an arresting officer and a person calling the suspected premises has been uniformly held to be admissible to show the purpose for which the premises are used. (*People* v. *Fischer,* 49 Cal.2d 442, 447 [317 P.2d 967]; *People* v. *Carella, supra.*)

The admissibility of the recorded calls thus turns on the question of relevancy and not on the hearsay issue. There is no precise and universal test by which relevancy may be determined. (*Larson* v. *Solbakken,* 221 Cal.App.2d 410, 420 [34 Cal.Rptr. 450]; McBain, Cal. Practice, p. 204.) The general test of relevancy in a criminal case is whether the evidence "tends logically, naturally, and by reasonable inference to establish any fact material for the People or to overcome any material matter sought to be proved by the defense." (*People* v. *Kelley,* 66 Cal.2d 232, 239 [57 Cal.Rptr. 363, 424 P.2d 947]; *People* v. *Durham,* 70 Cal.2d 171, 186 [74 Cal.Rptr. 262, 449 P.2d 198]; *People* v. *Kendrick,* 56 Cal. 2d 71, 87 [14 Cal.Rptr. 13, 363 P.2d 13]; *People* v. *Jones,* 42 Cal.2d 219, 222 [266 P.2d 38]; *People* v. *Peete,* 28 Cal.2d 306, 315 [169 P.2d 924].) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Evidence tends "in reason" to prove a fact when "the evidence offered renders the desired inference *more probable than it would be without the evidence.*" (McCormick, Evidence, p.

318; James, 29 Cal.L.Rev. 689, 699; 1 Wharton, Criminal Evidence (12th ed.) p. 287; see *Mutual Life Ins. Co. v. Hillmon,* 145 U.S. 285, 295 [36 L.Ed. 706, 710, 12 S.Ct. 909].) ▮ Evidence is relevant not only when it tends to prove or disprove the precise fact in issue but when it tends to establish a fact from which the existence or nonexistence of the fact in issue can be directly inferred. (Law Revision Com. Comment, § 210, Evid. Code; *Firlotte v. Jessee,* 76 Cal.App.2d 207, 210 [172 P.2d 710]; Witkin, Cal. Evidence (2d ed. 1966) § .302.). ▮ The trial court is vested with wide discretion in deciding relevancy. (*People v. Smith,* 13 Cal.2d 223, 227 [88 P.2d 682]; *Adkins v. Brett,* 184 Cal. 252, 258 [193 P. 251]; *Larson v. Solbakken, supra,* 221 Cal.App.2d 410, 420; *Moody v. Peirano,* 4 Cal.App. 411, 418 [88 P. 380].)

▮ In the present case defendant testified that despite pressures exerted by Clark, including a threat to "break" the Warners, he refused to have anything to do with the illegal venture, and that after his refusal the relationship between the two became cold and indifferent. Mrs. Warner's calls and the statements she made in them tended to refute defendant's testimony. It would seem highly improbable that defendant's wife would have called Clark and, in effect, warned him if the feeling between defendant and Clark was, as described by defendant. From the timing of the calls and the statements made, it may be reasonably inferred that Mrs. Warner knew that her husband was involved in bookmaking with Clark and makes more probable the fact that he was a co-conspirator. ▮ One inference may be based upon another where the first is properly drawn from sufficient evidence and the second inference is not too remote or speculative. (*People v. Davis,* 235 Cal.App.2d 214, 225 [45 Cal.Rptr. 297]; *People v. Vignoli,* 213 Cal.App.2d 855, 857 [29 Cal. Rptr. 260]; Witkin, Cal. Evidence (2d ed. 1966) *supra,* p. 1052.) ▮ The trial court did not abuse its discretion in determining that the evidence was relevant.

▮ Defendant's contention that the recorded conversation was obtained in violation of Mrs. Warner's Fourth Amendment rights is without substance.[1]

▮ In bookmaking cases it is not improper for an arrest-

---

[1]Defendant has standing to raise the issue. (*People v. Martin,* 45, Cal.2d 755, 759 [290 P.2d 855]; *People v. Johnson,* Supreme Court, Crim. 12804, decided March 3, 1969 (70 Cal.2d 541 [75 Cal.Rptr. 401, 450 P.2d 865]; see *People v. Varnum,* 66 Cal.2d 808, 812 [59 Cal.Rptr. 108, 427 P.2d 772].)

ing officer to answer a telephone call to the suspected premises and purport to oblige the caller. (*People* v. *Fischer, supra,* 49 Cal.2d 442, 447; *People* v. *Carella, supra,* 191 Cal.App.2d 115, 139; see *People* v. *Pompei,* 267 Cal.App.2d 531, 583, fn. 2 [73 Cal.Rptr. 163].) The officer may properly conceal his identity and pretend to be the intended recipient of the call. (*People* v. *Sandoval,* 65 Cal.2d 303, 308 [54 Cal.Rptr. 123, 419 P.2d 187]; see *People* v. *Malotte,* 46 Cal.2d 59, 63-64 [292 P.2d 517].) Taking and recording such calls does not constitute "an interception" within the meaning of section 605 of the Federal Communications Commission Act (*Rathbun* v. *United States,* 355 U.S. 107, 109 [2 L.Ed.2d 134, 136, 78 S.Ct. 161, 163]; *United States* v. *Pasha,* 332 F.2d 193, 197-198, *cert. den.* 379 U.S. 839 [13 L.Ed.2d 45, 85 S.Ct. 75]; *People* v. *Malotte, supra,* 46 Cal.2d 59, 63-64; *People* v. *Carella, supra,* 191 Cal.App.2d 115, 138-139; see *People* v. *Jones,* 254 Cal. App.2d 200, 220 [62 Cal.Rptr. 304]) or a violation of former section 640 of the Penal Code.[2] (*People* v. *Malotte, supra; People* v. *Carella, supra.*)

In *People* v. *Sandoval, supra,* 65 Cal.2d 303, 306, officers arrested several persons pursuant to an arrest warrant for a burglary and lawfully entered a house which, according to the information possessed by the officers concealed burglary loot and heroin and served as a narcotics headquarters. In addition, the officers had information that at least one "narcotics connection" normally contacted one of the arrestees at the house by telephone. During the search of the house. the telephone rang. One of the officers answered and pretended to be the intended recipient of the call. On the admissibility of the telephone conversation, the court stated at p. 308: "Because the officers were engaged in a lawful search, and because the information supplied by the deputy district attorney rendered incoming telephone calls reasonably suspect, the officers could justifiably answer the telephone and conceal their identity from the caller in order to learn of possible unlawful activities."

Defendant urges that *People* v. *Sandoval, supra,* is irreconcilable with the subsequent decision of *Katz* v. *United States,* 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507]. *Katz* held that

[2]Defendant urges that the recordation of the conversations constituted violations of sections 631 and 632 of the Penal Code. However, those sections were added by Statutes of 1967, chapter 1509, effective November 8, 1967, and were not in force when the present case was tried. Therefore, we need not consider the effect, if any, of those sections.

despite the absence of physical trespass, electronic surveillance of a telephone conversation between a suspect and a third person constituted a search and seizure under the Fourth Amendment and that such electronic surveillance could not be justified under any recognized exception to the rule requiring prior judicial approval. In acknowledging the existence of exceptions, the Court observed:

"It is difficult to imagine how any of those exceptions could ever apply to the sort of search and seizure involved in this case. Even electronic surveillance substantially contemporaneous with an individual's arrest could hardly be deemed an 'incident' of that arrest. [Fn. omitted.] Nor could the use of electronic surveillance without prior authorization be justified on grounds of 'hot pursuit.' [Fn. omitted.] and, of course, the very nature of electronic surveillance precludes its use pursuant to the suspect's consent." (389 U.S. 357-358 [19 L.Ed. 2d at pp. 585-586].)

*Katz*, however, does not undermine *People* v. *Sandoval* on the issue under review. It does not require us to hold that the conduct of the officer in answering the telephone and recording the conversations constituted an unlawful search and seizure. There are significant factors bearing upon the reasonableness of the "search and seizure" which materially distinguish the present case from *Katz*. ▉ The "seizure" in the present case was incident to a valid arrest.[3] Moreover, unlike *Katz*, the officer did not listen in on a conversation between others; the officer who recorded the conversation was himself a party to it. Thus, this case does not actually involve eavesdropping. The question here presented is whether one who knowingly calls a telephone number used for an illegal activity is entitled to a constitutionally protected expectation that the person with whom he converses is the person he purports to be. As the evidence in the present case reveals, in telephonic communications with bookmakers, true names and identities of the parties are ordinarily concealed. When Mrs. Warner called, she inquired whether the phone was "tapped" and whether others were present. The tenor of her conversation indicated a doubtful expectancy of privacy. It is

---

[3]The officers not only had probable cause to arrest, they had a search warrant for the premises. The legality of the entry and arrest are unchallenged. In discussing the legality of the conduct of the officers in answering and recording Mrs. Warner's calls, the Attorney General alludes to the search warrant but does not attempt to justify the "seizure" of incoming calls on the basis of the warrant. Since the warrant is not a part of the record, we are not apprised of its scope.

not unreasonable intrusion on privacy for a police officer in the circumstances here presented to answer suspected calls and pretend to be the person for whom the call was intended. The "seizure" of Mrs. Warner's calls did not constitute an unreasonable search and seizure proscribed by the Fourth Amendment.

Having concluded that the act of the officer in answering the telephone and in engaging in the conversation was proper, the additional act of recording the conversation did not violate Mrs. Warner's constitutional rights. She did not have a "constitutional right to rely on possible flaws in the agent's memory, or to challenge the agent's credibility without being beset by corroborating evidence that is not susceptible of impeachment." (*Lopez* v. *United States,* 373 U.S. 427, 438-439 [10 L.Ed.2d 462, 470-471, 83 S.Ct. 1381-1387] ; *People* v. *Hinman,* 253 Cal.App.2d 896, 903 [61 Cal.Rptr. 609].)

Defendant contends that his conviction was based upon the uncorroborated testimony of accomplices. The corroboration required by Penal Code, section 1111, is sufficient if it tends to connect the defendant with the commission of the crime in such a manner as reasonably to satisfy a jury that the accomplice is telling the truth. (*People* v. *Luker,* 63 Cal.2d 464, 469 [47 Cal.Rptr. 209, 407 P.2d 9] ; *People* v. *Holford,* 63 Cal.2d 74, 82 [45 Cal.Rptr. 167, 403 P.2d 423].)

Corroborating evidence is sufficient if it connects the defendant with the crime even though, by itself, it may be slight and entitled to little consideration. (*People* v. *Holford, supra,* at p. 83.) In the present case, independent of the testimony of the accomplices, there was uncontradicted evidence that the defendant co-signed for the telephone service used in the illegal venture. In addition there was evidence that police officers placed bets by calling the telephone number; that defendant approached a person to interest him in investing in the bookmaking operation; and that in seeking police protection, Clark revealed to Officer Powers that defendant was a member of the conspiracy.

Finally, defendant contends that the court erred in refusing the following proffered instruction : "Testimony of an accomplice may not be corroborated by the statements or acts of such accomplice made outside the trial of the case." The instruction was incorrect both as to extrajudicial statements of an accomplice and his acts.

Section 1111, Penal Code, provides in part: "A conviction can not be had upon the testimony of an accomplice unless it

be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." The reason for the rule expressed in section 1111 is that "[a]n accomplice usually testifies in the . . . expectation of immunity and his testimony is not entitled to the same credit as an ordinary witness." (8 McBain, Cal. Practice, *supra*, p. 531.) That infirmity does not exist with respect to extrajudicial statements made by a co-conspirator during the existence of and in furtherance of the conspiracy. There is no policy justification or anything in the language of section 1111 precluding the use of such out-of-court statements of an accomplice as corroborating evidence when they are proven by the testimony of someone other than the accomplice. Acts of an accomplice may clearly be considered in corroboration. "The entire conduct of the parties, . . . during and after the crime, may be taken into consideration by the jury in determining the sufficiency of the corroboration." (*People* v. *Griffin*, 98 Cal.App.2d 1, 25 [219 P.2d 519].) The requested instruction was properly refused. The record discloses that the court gave complete and proper instructions on the subject of testimony of accomplices and corroboration.

Purported appeal from the judgment is dismissed. Order granting probation is affirmed.

McCabe, P. J., and Fogg, J. pro tem.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 14, 1969.

---

*Assigned by the Chairman of the Judicial Council.