[Civ. No. 35940. Second Dist., Div. Three. Feb. 22, 1971.]

AURORA C. RUIZ et al., Plaintiffs and Respondents, v.
MINNESOTA MINING & MANUFACTURING CO.,
Defendant and Appellant;
STATE COMPENSATION INSURANCE FUND,
Intervener and Respondent.

## COUNSEL

Haight, Lyon & Smith, Robert L. Dickson and Henry F. Walker for Defendant and Appellant.

Magana, Olney, Levy & Cathcart and Richard Devirian for Plaintiffs and Respondents.

T. Groezinger, Loton Wells and Herbert Lasky for Intervener and Respondent.

## OPINION

**COBEY, J. Acting P. J.**—Defendant Minnesota Mining & Manufacturing Company (Manufacturer) appeals from a judgment in strict liability entered on verdicts against it in favor of plaintiffs, Aurora Ruiz, Manuel Gonzales, Henrietta Aragon and Jose Sandoval, employees of Marspring Corporation, and in favor of plaintiff in intervention, State Compensation Insurance Fund (Insurer). The verdicts for the employees were for dam-

ages occasioned by their illness; these totaled $37,203.96. The verdict in favor of Insurer was for $33,941.82 and represented the stipulated amount of workmen's compensation benefits previously paid the employees by Insurer.

The case went to the jury on alternative bases of liability of Manufacturer—negligence and strict liability. Manufacturer does not challenge the substantiality of the evidence supporting the minimum verdicts in strict liability. It contends instead that the trial court committed reversible error in admitting Dr. Sokol's expert testimony on the effects of glue-sniffing on children, in admitting evidence of the toxicology of benzene, and in conditionally directing the verdict in favor of Insurer.

We find no reversible error in the admission of the evidence challenged by Manufacturer. We hold with respect to the portion of the judgment in favor of Insurer that where the claimed negligence of a user of a defective product, unreasonably dangerous to the user, is not of such a nature as would bar recovery in strict liability by the user from the manufacturer of the product, the strict liability of the manufacturer may not be shared with the workmen's compensation insurer of the user. To our knowledge this precise holding is unprecedented in this state or elsewhere.

### BACKGROUND

Plaintiff employees were four of seven regular cushion assemblers of Marspring. They used a quick-drying adhesive or glue to assemble cushions in around four minutes from essentially polyurethane foam and springs.

The adhesive or glue (EC 2125) had been specially developed for Marspring alone by Manufacturer about the end of 1958. EC 2125 consisted of approximately 75 percent solvents and 25 percent solids. The solvents were acetone, toluene and hexane in approximately equal parts.

The four plaintiffs became ill in February, March and early April, 1962; they all developed peripheral neuropathy. This is damage to the nerves controlling the muscles of the extremities. The symptoms of this damage were generally numbness, coldness and marked tremors in both hands and legs, and an eventual loss of grip in the hands and difficulty in walking, both continuing for sometime.

There was no disagreement among the parties as to the nature of plaintiffs' illness; or that it was work-connected. There was strong disageement and conflicting expert testimony, however, as to whether the constant presence in the air of solvent vapors from the evaporting EC 2125 and

the continual presence of the glue itself on the plaintiffs' hands throughout the working day caused their illness.[1] Plaintiffs' theory of the causation of their illness, simply stated, was that it was due to toluene poisoning caused by the remnants of benzene normally found in the toluene in EC 2125.

In support of its position that EC 2125 did not cause plaintiffs' illness, Manufacturer introduced evidence that, aside from plaintiffs, no cushion assemblers at Marspring had ever experienced this illness in 11 years of assembling cushions in the manner plaintiffs did; that none of plaintiffs experienced the damage to the blood forming organs frequently associated with toluene poisoning; that samples of the solvent vapors in the air in the cushion assembling area taken under the direction of Mr. Hauger from one to six months after plaintiffs became ill contained no benzene whatsoever; that this result was consistent with the advances made in the distillation of toluene; that the average concentration of solvent vapors found in the area in Mr. Hauger's tests was only 400 parts per million,[2] a safe level, since EC 2125 contained the same blend of solvents in evaporation as it did originally; and that at least three of the four plaintiffs, and probably the fourth as well, had four times a day cleaned EC 2125 off their hands with a paint thinner containing benzene.

On the other hand, in support of their theory that their illness was caused by their constant exposure at work to EC 2125, plaintiffs introduced evidence that all toluene normally contains remnants of benzene from the distillation process; that benzene is much more toxic than toluene; that constant exposure to toluene vapors may be dangerous to an individual if in a concentration of over 200 parts per million; that there was a strong smell of glue that was always present in the cushion assembly area and that this indicated that toluene vapors were there at a dangerous level of concentration; that the fact that toluene evaporated at the slowest rate of the three solvents in EC 2125 tended to make the vapors in the air mostly toluene toward the end of the evaporation period; that toluene, as a dissolvant of fat, damaged the nerves in plaintiffs' extremities by dissolving the myelin sheaths surrounding them; that plaintiffs experienced at least two of the many symptoms of toluene poisoning found by Dr. Sokol in his research on the effects of toluene poisoning on human beings, namely, numbness and marked tremors of the extremities; and that the use of the paint thinner was not the cause of plaintiffs' illness because one of the plaintiffs, according to his testimony, never used the thinner at all.

[1] Plaintiffs' principal exposure was through their lungs rather than their skin.

[2] The concentration in the samples ranged as high as 1,000 parts per million. The readings above 400 parts per million were approximately equal in number to those below 400.

## The Admissibility of Dr. Sokol's Testimony

■ One of the plaintiffs' witnesses in their case in chief was the previously mentioned Dr. Jacob Sokol, an internist in private practice, who had been chief physician at the Central Juvenile Hall in Los Angeles for close to five years. There he examined over a thousand youngsters for the immediate physical and psychological effects of glue sniffing, i.e., toluene poisoning. Prior to Dr. Sokol's research from January 1962 to 1966 very little was known of the effects upon human beings of toluene poisoning. Among the 18 symptoms of toluene poisoning which Dr. Sokol found in one child or another were tremors and numbness of the extremities.

At trial Manufacturer made timely objection to the admission of Dr. Sokol's testimony regarding this research on the ground that due to the dissimilarity in the conditions of inhalation and the contents inhaled, and the difference in the ages of the inhalers, such testimony was prejudicially irrelevant. (See Evid. Code, §§ 350, 352.)

In support of this position Manufacturer has referred us to 2 Wigmore on Evidence (3d ed. 1940) section 442, where it says at page 425, "The general logical requirement is, then, that when a thing's capacity or tendency to produce an effect of a given sort is to be evidenced by instances of the same effect found attending the same thing elsewhere, these other instances . . . are relevant—to show such a tendency or capacity *only if the conditions or circumstances in the other instances are similar to those in the case in hand."* [¶] . . . The similiarity that is required is, in short, a similarity in essential circumstances, or . . . a similarity in *such circumstances or conditions as might supposably affect the result in question."* (Italics author's.)

California, however, takes a broader view of relevancy. According to Evidence Code section 210 relevant evidence means any evidence having a rational tendency to prove or disprove any disputed fact that is of consequence to the determination of the action.[3] Under Evidence Code section 351, all relevant evidence is admissible, except as otherwise provided by statute. Dr. Sokol's expert testimony was offered on the hotly contested issue of the causation of plaintiffs' illness. As previously stated, plaintiff's theory of Manufacturer's liability was that plaintiffs had become ill from toluene poisoning. The only person who had done extensive research on the effects of toluene poisoning upon human beings was Dr. Sokol. His testi-

---

[3]Relevancy is probative worth. The most accepted test of relevancy is: Does the evidence offered render the desired inference more probable than it would be without the evidence? (McCormick on Evidence (1954) §§ 151, 152, pp. 314, 318; cf. Witkin, Cal. Evidence (2d ed. 1966) § 302, p. 266; *People* v. *Warner,* 270 Cal.App.2d 900, 907 [76 Cal.Rptr. 160].)

mony was offered in an attempt to show that the common possession by youthful glue-sniffers and by plaintiffs of two of the the same symptoms, namely, numbness and tremors of the extremities, indicated that the cause of plaintiffs' illness was toluene poisoning.

It is true, as Manufacturer argues, that the conditions generally of inhalation of toluene of the children examined by Dr. Sokol and plaintiffs at work were different. But, Dr. Sokol, who is the recognized authority on the effects of toluene poisoning on human beings, was asked specifically as to whether any of these differences in age, concentration inhaled and duration of inhalation were necessarily controlling in determining whether an individual became sick from toluene poisoning. He answered that they were not and that instead, whether a person became sick from exposure to toluene depended primarily on that person's susceptibility to the poisoning.

We hold that the court did not abuse the discretion granted it by Evidence Code section 352 in refusing to exclude the expert testimony of Dr. Sokol on the effects of toluene poisoning.[4]

### Admissibility of the Evidence of the Toxicology of Benzene

■ Under cross-examination, a witness for Manufacturer, the previously mentiond Louis S. Hauger, Director of Environmental Health for the City of Vernon, on direction and over Manufacturer's vigorous objection read from Irving Sachs' book on "Dangerous Properties," copyrighted in 1957, the portion on the toxicology of benzene.[5] Counsel for Manufacturer, in making his objection of prejudicial irrelevancy, said "We don't have benzene in this lawsuit."

In this position he was mistaken. As stated earlier, it is true, that the solvents in EC 2125 were acetone, toluene and hexane. Furthermore, no benzene was found in the samples of solvent vapors taken under Mr. Hauger's direction in the cushion assembly area of Marspring some one to six months after plaintiffs became sick. Finally, there was testimony that due to improvements in the distillation process all benzene has been eliminated from toluene.

---

[4]Evidence Code section 352 in relevant part provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

[5]Hauger considered this book along with other literature in making his recommendation regarding the solvent vapor problem at Marspring. For this reason Manufacturer's counsel made no objection when on cross-examination Mr. Hauger read into the record from the book the toxicology of toluene.

On the other hand, there was evidence that toluene still contains remnants of benzene from the distillation process. The foregoing conflict in the evidence on this point must be resolved in favor of plaintiffs since they obtained a favorable verdict below against Manufacturer. (See *Turner* v. *Mannon*, 236 Cal.App.2d 134, 136 [45 Cal.Rptr. 831]; *Hartzell* v. *Myall*, 115 Cal.App.2d 670, 672 [252 P.2d 676].)

The evidence concerning the toxicology of benzene was properly admitted.

### THE CONDITIONALLY DIRECTED VERDICT IN STRICT LIABILITY IN FAVOR OF INSURER

 It will be recalled that this case went to the jury on alternative bases for Manufacturer's liability to plaintiff employees of Marspring—negligence and strict liability. Among the instructions given the jury was the following: "If you decide that the plaintiffs are entitled to judgment against the defendant by reason of a defect in the manufacture or design of the adhesive manufactured by defendant, you will return a verdict in favor of the Intervenor, State Compensation Insurance Fund, against defendant in the amount of $33,941.82."

The instruction in effect directed a verdict in favor of the Intervener, State Compensation Insurance Fund, the insurer of Marspring, provided the jury found for plaintiff employees of Marspring on the basis of strict liability as opposed to negligence.

As we have said previously, Manufacturer has not challenged the substantiality of the evidence supporting the verdict in strict liability against it in favor of plaintiff employees of Marspring. Nor has it challenged the correctness of the instructions otherwise. It challenges only the just-quoted instruction upon the ground that the evidence introduced by Manufacturer proved that the illness of the plaintiff employees of Marspring was occasioned in part by the failure of Marspring to provide proper ventilation for the cushion assembly area and to provide proper respiratory protective equipment. It argues that this concurrent negligence on Marspring's part bars its subrogee Insurer (see Ins. Code, § 11662) from recovery against Manufacturer.

In the discussion that follows we shall assume, without so deciding, that Marspring was negligent in not providing its harmed employees with either adequate ventilation or adequate protective respiratory equipment.

The liability that Manufacturer seeks to share with Marspring is, however, strict liability—the special liability of the seller of certain types of products, for physical harm to the user or consumer of those products. (See Rest. 2d Torts (1965) § 402A.) It is a liability which applies only to participants in the marketing of such products. (See Rest. 2d Torts (1965) § 402A, *supra,* coms. c & f; *Vandermark* v. *Ford Motor Co.,* 61 Cal.2d 256, 262 [37 Cal.Rptr. 896, 391 P.2d 168].) Marspring was not such a participant. It was instead a user and consumer of Manufacturer's product—the adhesive, EC 2125.

 Contributory negligence on the part of a user of such a product is not a defense to the imposition of this marketer's liability when the user's contributory negligence consists of either a failure to discover the defect in the product or to guard against the possibility of its existence. On the other hand, if the user discovers the defect and is aware of the danger and nevertheless unreasonably uses the product to his injury, his contributory negligence bars him from recovery. (See Rest. 2d Torts (1965) § 402A, *supra;* Prosser, *Strict Liability to the Consumer in California,* 18 Hastings L.J. 9, 48-49; *Barth* v. *B. F. Goodrich Tire Co.,* 265 Cal.App.2d 228, 243 [71 Cal.Rptr. 306], hg. den.) There is no evidence of this latter kind of negligence by Marspring in the record before us. No claim of such negligence was made by counsel for Manufacturer in his argument to the jury or in his briefs and oral argument to us.

Furthermore the evidence recounted by our esteemed colleague in his separate opinion, dissenting on this point alone, relates almost entirely to the negligence we have assumed on Marspring's part in not providing its employees with either adequate ventilation or adequate protective respiratory equipment. We fail to see how the labels on EC 2125, which our colleague apparently agrees did not warn plaintiff employees sufficiently of the *toxic* nature of the product, may nevertheless be regarded, as having made their employer, Marspring, likewise a user of the product, aware of its toxic nature.

The assumed negligence of Marspring, a user of EC 2125, was not of the type that would bar recovery by it in strict liability from the marketer of EC 2125, Manufacturer. In other words, Marspring's conduct was not such as to make it contributorily liable. This being the case, neither should its subrogee, Insurer, share in Manufacturer's strict liability. In short, Marspring was not a joint tort-feasor with Manufacturer. In this fundamental respect this case differs from *Witt* v. *Jackson,* 57 Cal.2d 57 [17 Cal. Rptr. 369, 366 P.2d 641]; *Pearson* v. *Ford Motor Company,* 273 Cal. App.2d 269 [78 Cal.Rptr. 279], hearing denied; *Badorek* v. *General Motors*

*Corp.* *(Cal.App.) 90 Cal.Rptr. 305, and *Barth* v. *B. F. Goodrich Tire Co., ante,* page 137 [92 Cal.Rptr. 809].

The judgment is affirmed.

Schweitzer, J., concurred.

**ALLPORT, J.**—Under applicable rules of appellate review I feel compelled to affirm that portion of the judgment entered in favor of plaintiffs, Ruiz, Gonzales, Aragon and Sandoval.

With respect to the opinion of the majority affirming the portion entered in favor of plaintiff-in-intervention, I dissent. In my opinion inadequate and improper jury instruction in this case has resulted in a miscarriage of justice and that the opinion of the majority will be instrumental in perpetuating such injustice in future litigation of this character. The form of the affirmative defense as pleaded in the answer to the complaint-in-intervention leaves much to be desired but may be considered sufficient to raise the defense in issue. The jury instructions requested by defendant, and as finally given by the court were, in general, confusing and inadequate and, in particular, the failure properly to instruct on the affirmative defense and the giving of intervener's No. 1 reading as follows was error: "If you decide that the plaintiffs are entitled to judgment against the defendant by reason of a defect in the manufacture or design of the adhesive manufactured by defendant you will return a verdict in favor of the Intervenor, State Compensation Insurance Fund, against defendant in the amount of $33,951.82." This instruction in effect directed a verdict in favor of intervener if the jury finds defendant liable to plaintiffs on the theory of strict liability, thus eliminating consideration of any affirmative defense. Plaintiff-in-intervention, employer's workmen's compensation carrier, stands in the employer's shoes and has no greater rights against a third party tortfeasor than does the employer itself. A negligent employer may not recover compensation benefits paid from a third party tortfeasor. "Thus, whether an action is brought by the employer or the employee, the third party tortfeasor should be able to invoke the concurrent negligence of the employer to defeat its right of reimbursement, since, in either event, the action is brought for the benefit of the employer to the extent that compensation benefits have been paid to the employee." (*Witt* v. *Jackson,* 57 Cal.2d 57, at p. 72 [17 Cal.Rptr. 369, 366 P.2d 641].) The mere fact that the theory of recovery may be strict liability does not deprive the third party tortfeasor of its right to assert any available legal defenses. "Fault"

---

*A hearing was granted by the Supreme Court on January 14, 1971, and the case was retransferred to the Court of Appeal, Third District. Thereafter, on April 19, 1971, the case was dismissed.

on the part of the employer may be such a defense. (*Barth* v. *B. F. Goodrich Tire Co.*, 265 Cal.App.2d 228, 243 [71 Cal.Rptr. 306].) In the instant case the record discloses that the employer furnished a volatile adhesive in drums to its employees for use in the gluing department. This department was permeated by glue vapors. The drums were labeled: "Warning Flammable Mixture. Vapors harmful. Use only in well ventilated areas. Before using: Extinguish all flames and pilot lights. Keep product and its vapors away from heat, sparks and flames. During application and until vapors are gone, avoid using spark producing electrical equipment such as switches, appliances, etc. Avoid prolonged breathing of vapors and repeated contact with skin. Keep container closed when not in use." There was evidence of improper ventilation in the gluing department area. The presence of vapors was known to the employer. The lack of ventilation was called to the employer's attention with the result that two small fans were installed. One employee testified that he was told by the foreman that too much air would cause the glue to dry too fast. A meeting with the shop steward on the subject of glue vapors was had in the front office on a workday. There was substantial testimony as to the inefficiency of the fans. There was one window and one door kept open. Others were generally closed. No respirators were available although cloth masks were supplied but not used. This evidence was sufficient to permit of a finding that the employer(user-consumer of the product), being aware of the existence of danger. from "prolonged breathing of vapors and repeated contact with skin," proceeded to make use of the product in an unreasonable manner and in a manner condemned by Labor Code sections 6402, 6403, and 6404, as well as General Safety Orders 4100, 4101, 4102, 4103, and 4105, which form the subject matter of a number of instructions given to the jury. Assuming a finding of a knowledgeable unreasonable or illegal use of the product by the employer, the employer's compensation carrier should not be permitted to recoup workmen's compensation benefits paid to employees injured as a result of such use, whether the defense be legally labeled fault, contributory negligence, assumption of risk, or otherwise. As was said in *Barth, supra,* at page 243: "The only form of plaintiff's negligence that is a defense to strict liability is that which consists in voluntarily and unreasonably proceeding to encounter a known danger, more commonly referred to as assumption of risk. For such a defense to arise, the user or consumer must become aware of the defect and danger and still proceed unreasonably to make use of the product. This rule has been consistently followed and repeated by the courts of our state (*Seely* v. *White Motor Co.*, 63 Cal.2d 9 [45 Cal.Rptr. 17, 403 P.2d 145]; *Canifax* v. *Hercules Powder Co.*, 237 Cal.App.2d 44, 46 [46 Cal.Rptr. 552]; see. Prosser, *Strict Liability to the Consumer in*

*California,* 18 Hastings L.J. 9, 48-50)." In *Barth* it was determined that there was no evidence on which such a defense could be based. In the instant case an affirmative defense of employer's "fault" was pleaded. There was evidence supporting such a defense and requiring its submission to the jury under appropriate instructions. Defendant offered contributory negligence and assumption of risk instructions applicable to the individual plaintiffs which were given by the court. Neither was tailored to the cause of action presented by the intervener. While the failure to tender proper instructions to the court is sometimes deemed to be a waiver such cannot justify the directing of a verdict in this case, although I hesitate to reward counsel for his failure to be of more assistance to the trial court in this respect. The prejudicial effect of the giving of intervener's instruction No. 1 set forth above, was recognized by the trial court and the error should likewise have been recognized and corrected at the hearing of the motion for new trial.

It is anticipated that, in the absence of a learned expose on the subject by our high court, substantial confusion may result from this published opinion in the minds of those individuals governed by its content. The comments of the majority directed at this dissent are illustrative of the point.

I would reverse that portion of the judgment in favor of plaintiff-in-intervention.

A petition for a rehearing was denied March 18, 1971, and appellant's petition for a hearing by the Supreme Court was denied April 22, 1971.