Filed 3/16/16  P. v. Mayes CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JAMES ARTHUR MAYES,<br><br>        Defendant and Appellant. | A140982<br><br>(Contra Costa County<br>Super. Ct. No. 5-121622-5) |

Defendant James Arthur Mayes was convicted by jury of one count of first degree residential burglary.  The question before us is whether the trial judge erred by informing the jury that the court was taking judicial notice that the two individuals arrested with defendant immediately after the alleged incident had pled guilty to felony burglary arising from the same incident.  We conclude that the court erred in admitting this evidence, which was overwhelmingly more prejudicial than probative, but that the error was harmless under any standard.  We will affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged by information filed September 18, 2012, with a violation of Penal Code section 459/460, subdivision (a), first degree residential burglary.  Trial began on November 18, 2013.

*Opening Statements*

We summarize the opening statements, since the trial court relied on them in making the key evidentiary ruling in this case.

1

In a very brief opening statement, the prosecution described what the evidence would show. A neighbor spotted defendant breaking into a home in Kensington with two "accomplices;" he was arrested less than a half mile away, and about 15 minutes later, with two other individuals; he was identified at the scene by the neighbor; he was found with the victim-homeowner's debit card in his pocket; the sliding door of the victim's home was found open, and one of defendant's fingerprints was on the open door. The prosecutor told the jury that Breedlove, one of the young men defendant was arrested with, had a backpack containing screwdrivers, a razor scraper, and gloves.

In his equally brief opening statement, defense counsel said the evidence would show that there was a lack of evidence to show his client's specific intent to break and enter into a building, and a lack of evidence to show he facilitated, assisted, or encouraged others to break in. Defense counsel offered a version of events he "believe[d] happened that evening": "my client was with these two other guys and . . . he was near the scene," and the three men went "up high" in this "nice area with a nice view over the bay" in the hills "to get high, to get stoned." Defense counsel told the jury they would not hear any evidence that defendant was "ever in the place," nor any evidence as to how the debit card "ended up in my client's pocket."

*Evidence*

Glenn Christ was at his home on Purdue Avenue in Kensington on January 14, 2012, at about 3:30 p.m. when he saw three young black men walking very slowly across the street and stopping in front of the house across the street that belonged to his neighbor, Dr. Steven Rauch. The three men caught Mr. Christ's attention because they were walking very slowly and inspecting Rauch's house, and because he rarely saw strangers walk on his street, which was a private road and a dead end. He saw one of the men (later identified as defendant) walk up to the front door, appear to ring the door bell or knock, and then peer into the house. This person was wearing a pullover shirt that had horizontal black or dark blue and white stripes across the shirt. The two other men walked down the street out of Mr. Christ's view.

2

The person in the striped shirt then went back down the walkway and down the driveway, and nodded his head towards the direction the other two men had walked. All three men then walked back up the driveway under the carport and to the back part of Rauch's house, out of Mr. Christ's view. Thinking there was something suspicious, Mr. Christ called 911.

Kensington Police Officer Kevin Hui was dispatched to respond to the 911 call. No one was home at Rauch's house, and he found the sliding rear door of the house was partially open. The house backs up to an East Bay Regional Park area, and there is a dirt pathway behind it. Officer Hui asked a person doing some gardening along the pathway if he had seen three black male juveniles in the area; the neighbor said he had seen them running southbound down the trail and away from the location. Hui radioed for support from El Cerrito police officers to go to the trailheads to search for the suspects.

Responding to the call, Sergeant David Wentworth arrived at one of the trailheads at about 3:43 p.m. Wentworth saw the three suspects, including defendant, who was wearing a black and white striped shirt and white hat that matched the description on dispatch. In short order, three suspects were detained: defendant, Curtis Breedlove, and Johnte Carter.

During a pat-down search, officers found a debit card in the name of Dr. Steven Rauch in defendant's wallet, along with an identification card with defendant's photograph and personal information. Breedlove was carrying a backpack, in which Officer Hui found two flathead screwdrivers, a razor blade scraper, a pair of gray fleece gloves, a pair of red knit gloves, and a single glove. Hui, who had previous experience investigating at least 75 or 80 residential burglaries, testified that the items in the backpack were consistent with items that would be used to commit a burglary.

The defense attorney cross-examined Hui about the tools seized from Breedlove's backpack and Breedlove's car. Hui testified that Breedlove had a 2002 Camaro, with more than 129,000 miles on it, and with scratches and dents. Asked whether the screwdrivers found in Breedlove's backpack are also commonly used to work on an old car, Hui agreed they are. Defense counsel further elicited testimony that nothing of value

3

was recovered from Breedlove's car, but "some green leafy substance" was recovered in the car.

On redirect examination of Hui, the prosecution offered in evidence photographs of Breedlove and Carter, and then followed up with questioning about Breedlove's backpack, asking whether anything found in the backpack was "inconsistent with using those items for a vehicle [repair]." Hui responded, "What was inconsistent was that the gloves were all fairly clean. Typically, gloves that are used while working on an engine compartment get very, very greasy and dirty. None of these gloves exhibited any type of physical grease markings or anything of that matter."

On recross-examination, defense counsel established that defendant was arrested in January, and then asked whether "[i]t's generally fairly cold in January." Eventually, Officer Hui gave the unremarkable answer that "typically the winter months would be colder than summer months."

Officer Hui was later recalled to the stand, and through his testimony the prosecution offered in evidence the contents of Breedlove's backpack. On cross-examination, defense counsel elicited testimony from Hui that two of the pairs of gloves weren't typically the kind of gloves used for working on cars, but that one glove, had some stains on it that might "possibly" be grease. Hui answered "yes" to the question that the screwdrivers "could as equally be used on a car as they could be used to break into a home."

The police drove Mr. Christ to the location where the suspects were apprehended, about a half mile from his house, where he positively identified defendant as the person he saw knocking at the front door of Rauch's house. As to the two other people, he could state only that they were the same size and ethnicity as the two others he had seen at his neighbor's property, and they had backpacks. Defendant was wearing a "white striped shirt." Defendant was placed under arrest at the scene.

Dr. Steven Rauch testified that he lived in the house in Kensington where the crime had occurred. When he returned home on January 14, 2012, he saw the back sliding door at his patio was open, and it shouldn't have been. Rauch looked around the

4

house and saw that it was not in the same condition as when he had left it. The house was in disarray; drawers had been opened and things taken out of them. A debit card in Rauch's name had been taken from his desk in the house. The desk was a half floor up from the open sliding back door; there was no way that anyone could have gotten the card without actually entering the house. Rauch did not know defendant, and defendant did not have Rauch's permission to be at the house that day, nor should he have had any of Rauch's property in his possession.

Sergeant Rickey Hull from the Kensington Police Department collected 19 fingerprints on the rear sliding glass door of Rauch's home. Kathryn Novaes, a latent fingerprint examiner with the Contra Costa Criminalistics Laboratory testified that there was no question in her mind that one of the fingerprints collected at the scene was matched to defendant's known fingerprint.

*Judicial Notice of Guilty Pleas of Co-arrestees Breedlove and Carter*

At the end of the first day of trial testimony, the prosecutor asked the trial court to take judicial notice of records of convictions showing that the two men detained with defendant had pled guilty to felony burglary of the same residence on the same date. The prosecutor argued the evidence was relevant "[b]ecause if you have two subjects who were contacted at the scene, the only issue here is that all three men were engaged in a common scheme or plan. They were all working together. That's the issue." He further argued, "So the reason this is relevant now especially is because defense counsel has worked to develop the insinuation that Mr. Breedlove's conduct was entirely innocent and Mr. Breedlove wasn't committing a crime. And the tools that he had in his backpack could have been used for innocent purposes, well, we all know that Mr. Breedlove admitted that he was involved in a burglary. . . . The fact that another codefendant pled to a burglary on that same day and both men were identified with the defendant would tend to show that these men were engaged in a common scheme."

Defense counsel objected strenuously that this was an attempt to "taint my client unfairly," that there were "huge [Evidence Code section] 352 issues with this," that defendant had not been charged with conspiracy, and that defendant's case was not joined

5

with the two other men at that point. He continued, "The jury can determine what they can. They can adduce what they want from the evidence as produced at trial but to start adding this inflammatory material at this point is highly prejudicial and a violation, I believe, of 352 and so I have a real problem with that especially since the DA said that's exactly why he wants to do it."

The trial judge responded that "it appears to be relevant that the two people arrested with Mr. Mayes were convicted of burglary for this incident," and the court could take judicial notice that "each one of them was convicted of burglaries from January 14, 2012."

Defense counsel also argued that the two men had pleaded guilty, and not been convicted, and the court at least should be truthful to the jury that the men pled to second-degree burglaries, which were not strikes. The court responded, "Well, the Court needs to balance the prejudice and the probative value. It's clearly probative that the two people arrested with Mr. Mayes were convicted of something from this case." Defense counsel noted that Breedlove and Carter entered pleas, but "[c]onviction implies they went through a jury trial and the evidence was adduced against them." The court replied, "That's fine but the point is that it is probative that they suffered a consequence. They got a conviction for this case. So I am going to take judicial notice. However, I can't do exactly what the prosecutor wants which is to say that they pled guilty to a burglary of this house because that's not what the court record reflects. On the other hand, to just say it was—to say it was a second-degree burglary, in the Court's mind it will confuse the jury as to why it is that your client is charged with first-degree burglary and cause the jury to speculate. And on balance I'm going to tell the jury that these two gentlemen pled guilty to a burglary for this incident on January 14th of 2012 and it looks like— . . . [¶] . . . both of them pled on February 16, 2012."

The following day the court announced outside the jury's presence that "[t]he only thing we're going to talk about . . . is if you have some case authority that tells me that I cannot take judicial notice." Defendant said he did, and again raised Evidence Code section "352 grounds."

6

The court responded that it was "already exercising 352 so I'm well aware of 352 and that's why I am—my tentative ruling yesterday was that I would say that they . . . pled guilty to a burglary for the incident occurring on January 14th, 2012."

Defense counsel then raised an objection that the admission of the evidence would violate his client's rights under the Confrontation Clause and *Crawford v. Washington* (2004) 541 U.S. 36. The trial court responded: "Well, the problem, Mr. Dombois, is the defense has made this evidence relevant. The defense made an opening statement which in essence said that Mr. Mayes had nothing to do with the burglary, he was in that area with two friends smoking dope. I mean, that's the essence. I know you said some other things but that's the essence of your opening statement. And your cross-examination of the prosecution witnesses so far has been for the purpose of trying to establish that Mr. Breedlove, who possessed the gloves and the screwdriver, possessed them for an innocent purpose i.e. working on his car. So it's the defense that has made this evidence relevant to begin with and the People are going to be allowed to bring in evidence of these convictions."

Defense counsel continued to object that the evidence was not relevant to whether or not his client committed a crime. Further, defense counsel disputed that he had made the evidence relevant, pointing out that the prosecution had offered the photographs of Carter and Breedlove in evidence, and that given the evidence in the case (eyewitness testimony that there were three young men at Rauch's house), the presence of the three men would have come out at trial, regardless of what defense counsel did.

Rejecting defense counsel's arguments, the court stated it had "already considered Evidence Code Section 352 in my balancing," and the court ruled that the convictions were admissible. The court stated that the defense had made this information relevant because of the defense strategy: "Because the defense has chosen to present through cross-examination an innocent explanation for why co-participant, Mr. Breedlove, possessed screwdrivers and gloves that innocent explanation clearly being that they were for work on his old battered-up high mileage car. The jury now is entitled to hear that

Mr. Breedlove pled guilty to a burglary in relationship to this case. So that is the end of the story. It is coming in."

Defense counsel objected that the court "presuppose[d] my strategy in my questioning" and that it was not his strategy to exculpate Breedlove.

At another conference outside the presence of the jury later that morning, defense counsel objected again based on *Crawford* and defendant's right to a fair trial. Invoking Evidence Code section 352, the court responded that it balanced the probative value against the prejudicial value, and would allow the prosecution to introduce evidence that the two men were convicted of felony burglary.

Over the objection of defendant, the trial court then informed the jury it was taking judicial notice "of the Contra Costa County Superior Court records" regarding the two men who were detained that day with defendant. The trial court told the jury that "[i]n the case of Mr. Breedlove, on February 16th of 2012, he pled guilty to a felony burglary that involved the same date in question here, January14th of 2012, for the events occurring on that day. [¶] Mr. Johnte Carter, on February 16th of 2012, pled guilty to a felony burglary for the events occurring on January 14th of 2012 arising from the same incident we're talking about here. [¶] So because I've taken judicial notice of those facts, no other evidence need to be shown to prove those facts."

This was the last evidence the jury heard before jury instructions and closing arguments, which followed immediately thereafter.

*Guilty Verdict and Sentencing*

The jury found defendant guilty as charged, after deliberating for about 20 minutes.[1] Imposition of sentence was suspended, and defendant was placed on three

---

[1] The jury received instructions and was taken to the deliberation room at 4:15 p.m. on November 21, 2013, and retired for the day 7 minutes later, presumably after selecting a foreperson as they had been instructed to do by the trial judge. They came back the following day at 9:14 a.m., and notified the deputy at 9:35 a.m. that they had reached a verdict.

years of formal probation with 210 days of county jail time to be served on home detention. Defendant was also ordered to pay certain fines and fees.

This appeal followed.

DISCUSSION

Defendant argues that there were multiple reasons why it was error for the trial court to take judicial notice of the guilty pleas of the two suspects with whom defendant was arrested for burglary: the evidence was irrelevant, it was more prejudicial than probative under Evidence Code section 352,[2] it was hearsay evidence without any exception, it was not properly the subject of judicial notice, it violated defendant's rights under the Confrontation Clause, and the error was prejudicial.

We conclude that even if the evidence was relevant, and even if it was properly the subject of judicial notice, it was an abuse of discretion to admit the testimony under section 352. We further conclude, however, that although the error was clear, the admission of the evidence was harmless under any standard because the evidence overwhelmingly pointed to defendant's guilt.

I. *Relevance and Section 352*

Only relevant evidence is admissible at trial (§ 350), and relevant evidence means "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210.) "There is no precise and universal test by which relevancy may be determined. [Citations.] The general test of relevancy in a criminal case is whether the evidence 'tends logically, naturally, and by reasonable inference to establish any fact material for the People or to overcome any material matter sought to be proved by the defense.' [Citations.] . . . Evidence tends 'in reason' to prove a fact when 'the evidence offered renders the desired inference more probable *than it would be without the evidence*.' " (*People v. Warner* (1969) 270 Cal.App.2d 900, 907.)

---

[2] All further statutory references are to the Evidence Code unless otherwise noted.

9

Under section 352, even if evidence is relevant, a trial court may exclude it when its "probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

We review claims regarding the trial court's admissibility of evidence for abuse of discretion. (*People v. Goldsmith* (2014) 59 Cal.4th 258.) The same standard applies to rulings on admissibility under section 352. (*People v. Lee* (2011) 51 Cal.4th 620, 642.) A trial court abuses its discretion " 'when its ruling "falls outside the bounds of reason." [Citations.]' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1149.)

Defendant argues on appeal that the fact that Breedlove and Carter pleaded guilty was irrelevant to the question of defendant's guilt. It was not relevant as to whether the neighbor correctly identified defendant, whether it was defendant's fingerprint on the door, or whether defendant's acts contributed to the commission of the burglary.

Implicitly conceding that the evidence was neither relevant nor admissible under section 352, the Attorney General does not disagree. Instead, she argues that "[p]rosecution evidence that would normally be irrelevant or inadmissible under section 352 can become admissible if the defendant opens the door to it." The Attorney General contends defendant opened the door to the evidence by acknowledging that defendant, Breedlove, and Carter were together near Rauch's house on the day of the burglary, and "then consistently us[ing] his cross-examination questions to try to elicit testimony in support of a defense theory that the three men were there for reasons unrelated to the burglary. In doing so, defense counsel put the activities of Mr. Breedlove and Mr. Carter at the time of the robbery squarely at issue and opened the door to the prosecution to refute the defense theory by showing that Mr. Breedlove and Mr. Carter did in fact participate in a burglary."

In support of the proposition that a defendant can "open the door" to inadmissible evidence, the Attorney General cites three cases, none of which is persuasive on the facts of this case. *People v. Rowland* (1992) 4 Cal.4th 238, simply establishes that a defendant can " 'open the door' " to testimony, but in *Rowland* there was no appellate review of the

issue because the trial court never ruled whether the proposed cross-examination would " 'open the door' " to challenged other crimes evidence and, thus, the issue was not preserved for appeal. In *People v. Marghzar* (1987) 192 Cal.App.3d 1129, 1136-1137, where defendant was charged with presenting a false or fraudulent insurance claim about an allegedly stolen car with intent to defraud, the court repeatedly admonished and instructed police officer witnesses outside the presence of the jury as to how to handle questions regarding another investigation that defense counsel contended was irrelevant, and conducted "numerous sidebar[s]" on the subject. The witnesses "exhibited caution and strict adherence to the court's admonition" as to how far they could go in answering questions. The trial court warned defense counsel that he might be opening the door by continually questioning witnesses as to the contents of various reports, and the questions could not be answered accurately without referring to unrelated criminal activity. "Only after defense counsel acknowledged the risk in the sidebar conference," and stated his position that "[i]f I ask something that opens the door, that's what is going to happen[,] [t]he door is open. . . . [¶] . . . then they are entitled to pursue that," did the court admit the evidence. (*Id*. at pp. 1136-1137, fn. 2.) *Marghzar* is thus nothing like this case, where the prosecutor made a sudden request for judicial notice, and there was no admonition or warning by the court. Finally, *People v. Wharton* (1991) 53 Cal.3d 522, 591-592, is also factually inapposite; when defense counsel there cross-examined a police officer about a confession that had previously been ruled inadmissible, the defendant opened the door for the prosecution to elicit the balance of the confession pursuant to section 356 and the rule of completeness.

Defendant contends that the line of questioning was relevant to show that defendant did not know, simply from the presence of the items in Breedlove's backpack, that they were burglary tools, and that an inference could be drawn from the presence of marijuana that he was up in the hills to smoke marijuana. Defendant contends that this testimony was not a sufficient basis to conclude that he had opened the door to evidence of Breedlove's and Carter's guilty pleas.

11

In our view, neither defense counsel's opening statement nor his cross-examination of Officer Hui opened the door. However, we need not resolve this issue because we conclude the trial court clearly abused its discretion in admitting the testimony under section 352. Whatever slim, if any, probative value the evidence had was vastly outweighed by the danger of substantial prejudice of guilt by mere association.

Defendant was the only person on trial in this case. There was no charge of conspiracy. The prosecution chose to introduce testimony about what was found in Breedlove's backpack, including testimony from Officer Hui that in his experience screwdrivers can be used as burglary tools. There was no evidence that the screwdrivers or anything found in Breedlove's backpack had been used in the charged robbery. Defense counsel asked a handful of follow-up questions to prosecution witnesses in cross-examination as to whether screwdrivers and gloves could be used to work on cars as well as for burglary tools, whether the glove looked like it had a grease stain, and whether the weather in January is typically colder than in winter (presumably to explain why one of the pairs of recovered gloves was fleece). It was fair cross-examination. At best, these questions were innocuous, and were more rhetorical than anything else; the average juror knows without the necessity of witness testimony that screwdrivers aren't always burglary tools, and the weather is colder in January in Alameda County than in the summer.

From the incidental amount of defense elicited testimony that we have described, the trial court made the decision to admit the convictions because "[i]t's clearly probative that the two people arrested with Mr. Mayes were convicted of something from this case." Although the trial court paid lip service to "352," the court never explicitly addressed the actual section 352 analysis, that is, weighing the prejudicial impact of informing the jurors that Breedlove and Carter had been convicted of residential burglary. Instead, it focused more on how to inform the jury about the guilty pleas and not *whether* to inform the jury about them at all.

The court's ruling was an abuse of discretion. The prejudicial impact clearly outweighed any slight probative value. The prosecution was concerned that defendant

was developing a theory that he had an innocent purpose for being present near Dr. Rauch's house.  But no witness ever testified that there was an innocent purpose for defendant's presence near the scene of the crime.  The unremarkable answers elicited in cross-examination (or suggested by defense counsel's questions) would be grist for a defense closing argument that the prosecution hadn't proven its case, including defendant's specific intent, beyond a reasonable doubt.  Defense counsel had adduced featherweight evidence about screwdrivers, fleece gloves, and scenic views in the East Bay hills.

Courts have long recognized the risk of guilt by association.  "The general rule is that evidence regarding the guilty plea or conviction of a co-participant in a crime is not admissible to prove guilt of a defendant.  (*People v. Cummings* (1993) 4 Cal.4th 1233, 1322; *People v. Leonard* (1983) 34 Cal.3d 183, 188-189.)  The rationale for the rule is that a guilty plea or conviction of a participant is irrelevant to whether another person was positively and correctly identified as a co-participant, and merely invites the inference of guilt by association."  (*People v. Neely* (2009) 176 Cal.App.4th 787, 795 (*Neely*).)[3]

By acquiescing to the prosecutor's unexpected request[4] to take judicial notice that Breedlove and Carter had pled guilty, the court swatted down the defense evidence with a

---

[3] In *People v. Leonard, supra,* 34 Cal.3d 183, our Supreme Court held that it was prejudicial error under section 352 to admit a co-participant's guilty plea in the trial of a defendant for robbery where the link between the two men, except for being arrested at the same time, was tenuous, and the case turned on the credibility of the witness identifications of the defendant.  The Attorney General attempts to distinguish *Neely* and the cases it cites by noting that the defendants in those cases did not "open the door" to the admission of the guilty pleas, and each of these cases also involved an "especially great risk of guilt by association" because, unlike here, the associates' guilt did not directly support the guilt of defendants.  We find this unpersuasive, expressly because the "opening the door" rationale was weak at best in the matter before us, and with no limits placed on the guilty plea evidence, the prejudicial effect was so great.

[4] We say "unexpected" because it does not appear on the record before us that the issue of the co-participants' guilty pleas was raised at any time before the prosecutor requested judicial notice at the end of the trial day on November 20, 2013.  There was

sledgehammer. There was a substantial danger that a jury hearing evidence of Breedlove and Carter's guilty pleas at the end of this relatively short case—and with no instruction limiting its use—would draw the inference that Mayes was guilty by association. Indeed, the trial court told defense counsel that had he *not* treaded into these waters, the judge had planned to instruct the jury with CALCRIM No. 373, which instructs the jury not to speculate about whether other persons, who may have been involved in the commission of the crimes charged, had been or would be prosecuted, but only to decide whether the defendant on trial committed the crimes charged. Unmoored by any such instruction, the jurors were told that Breedlove and Carter had pleaded guilty to burglary of Rauch's house, and were free to consider these facts in connection with whether defendant also committed the crimes charged.

We have no difficulty in concluding that the probative value of the evidence was substantially outweighed by the danger of prejudice, and it was an abuse of discretion to admit the evidence.

II.     *The Error Was Harmless Under Any Standard.*

We next address whether there was prejudice as a result of the admission of this evidence that requires reversal.

The erroneous admission of evidence under section 352 is reviewed under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*), which asks the question whether the error was harmless. In determining whether it was, we ask whether "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Id.* at p. 836.) A reasonable probability "does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*." (*College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.) A "reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington* (1984) 466 U.S. 668, 694.)

nothing in the record to suggest that the prosecution had ever objected that defense counsel was heading down a path of opening the door to this testimony, or that the court admonished defense counsel that he was at risk of doing so.

If we were to reach defendant's constitutional claim and conclude that the admission of the same evidence violated defendant's Sixth Amendment rights, our analysis of prejudice would be federal harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). (*People v. Geier* (2007) 41 Cal.4th 555, 608.) "Since *Chapman*, we have repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 681.) The harmless error inquiry asks: " 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' (*Neder v. United States* (1999) 527 U.S. 1, 18.)" (*People v. Geier*, *supra*, 41 Cal.4th at p. 608.) The burden is on the prosecution to prove the error " 'did not contribute to the verdict obtained.' " (*People v. Neal* (2003) 31 Cal.4th 63, 86 (*Neal*).) As our Supreme Court explained in *Neal*, this means we must " 'find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' [Citation.] Thus, the focus is what the jury actually decided and whether the error might have tainted its decision. That is to say, the issue is 'whether the . . . verdict actually rendered in *this* trial was surely unattributable to the error.' (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.)" (*Neal*, *supra*, 31 Cal.4th at p. 86.)

The Attorney General argues that "[w]hatever standard applies, any error in admitting evidence of the pleas was harmless because the remaining evidence against defendant was overwhelming." We agree. Whether under *Watson* or *Chapman* (assuming for this discussion we had found constitutional error), the error was harmless.

The prosecutor did not mention the guilty pleas in his brief initial closing argument. He did refer to them three times in his rebuttal closing argument.[5]

---

[5] In rebuttal closing argument, the prosecutor asked rhetorically, "How many sets of gloves did the police find?. . . [¶] . . . Three. How many guys are we dealing with here? Two guys who were convicted for this crime and their guy who, you know, acted

15

But even without the guilty plea evidence (and any argument referring to it), much of the trial evidence connected defendant to Breedlove and Carter, since the three men were seen together approaching Rauch's house, and were arrested together shortly thereafter. And defense counsel never denied the three men were together; his opening gambit was that the three were together in the hills enjoying the view and smoking marijuana.

The other evidence against defendant was overwhelming: Rauch's debit card in defendant's pocket (which the prosecutor referred to in rebuttal closing argument as "the central piece of prosecution evidence"), defendant's fingerprint on the back door, Mr. Christ's testimony and his field identification of defendant only about 15 minutes after the incident, and the screwdrivers and multiple pairs of gloves found in Breedlove's backpack. This evidence was more than enough to support a conviction for residential burglary beyond a reasonable doubt. The guilty pleas of Carter and Breedlove were not necessary to reach that verdict.

Defendant points out the jury deliberated only for about 20 minutes. This is not sufficient to persuade us that the error was not harmless beyond a reasonable doubt. Given the overwhelming amount of evidence against defendant, the shortness of the trial,

as the initiator, the guy who cleared the way, the guy that gave the signal, the guy who opened the door for them."

And later, "Ultimate question. Why did those convictions for the other accomplices what did those have to do anything at all with this case? Well, because it comes down to whether or not—whether or not circumstantial evidence of intent and circumstantial evidence generally, whether you're asked to draw reasonable or unreasonable conclusions, those things never—the other convictions never would have been relevant in this case. Except for then somebody decided to play the game of, oh, well, maybe Breedlove had the screwdrivers and the three sets of gloves, maybe he was going to fix a car with those two screwdrivers . . . ."

And again: "Those guys were every bit as involved as the defendant was. They acknowledged they're guilty. The defendant is guilty. Let's move on."

In his final summary, stressing defendant's intent, the prosecution referred to the "criminal plan between three people." "Two of those people have acknowledged, yes, I burglarized that place. Yes, I was involved in this burglary and pled guilty."

and the straightforward testimony and evidence, we cannot say on this record that 20 minutes of deliberation was insufficient time for the jury to find defendant guilty in this case, even without the admission of the guilty pleas.

Concluding as we do that the error in admitting the evidence was harmless under any standard, we do not need to address defendant's other arguments regarding the admission of the evidence, including judicial notice and Confrontation Clause issues.

DISPOSITION

The judgment of conviction is affirmed.

_____
Miller, J.

We concur:


_____
Kline, P.J.


_____
Stewart, J.




A140982, *People v. Mayes*